# PAGE *v.* STATE.

In Banc. Feb. 13, 1950.

No 37333 (44 So (2d) 459)

**Brown & Brown,** for appellant.

**George H. Ethridge**, Assistant Attorney General, for appellee.

**Lee, J.**

The appellant, John Davis Page, was convicted of the murder of his wife, Annie Bell Page, the jury fixing his punishment at imprisonment in the penitentiary for life. From a judgment in accordance with the verdict of the jury, he appeals.

Page lived with his wife several miles from DeKalb. Between three and four o'clock in the afternoon on Christmas Day, 1948, he went to the office of Dr. V. M. Creekmore in the town of DeKalb to get the doctor to attend his wife, explaining that she had fallen on the doorsteps and cut a place on the front part of her head. The doctor smelled a strong odor of whiskey, and was of the opinion that Page had been drinking. The doctor told Page that he had another call to make. Thereupon, Page said his wife was in pretty bad shape, and at his insistence, the doctor decided to go on to her then. Page rode in the doctor's car out to the house.

Upon arrival, the doctor made an examination of the injured woman, which disclosed the following: Annie Bell Page was lying on the bed, in a cold, clammy sweat. One eye was open and the other closed. Her pulse was weak, respiration was bad, and she was getting her breath just once in a while. Blood was all over her face and head. There was a cut across the top of her head, and the woman was in a dying condition. The doctor told Page that his wife was dying, and was in such condition that he could do nothing for her. On being thus informed, Page became somewhat excited, and asked the doctor about whether she should be taken to the hospital. The doctor advised him that, if she were then at the hospital, probably something could be done; but she might die before she could be taken. Page then left to procure someone for this purpose.

The doctor remained at the house thirty or forty minutes, and during this interval, made observations about the house. The window by the bed on which the woman was lying had been covered by a blanket. The bed, the quilts thereon, the floor beneath, and other parts of the room were bloody. There was lots of fresh blood over the floor in the adjoining room and in the kitchen. An effort had been made to wash it up with water. He did not see any blood on the doorsteps, and the wounded woman was not dressed to go anywhere. Page procured a white man, Mr. Marion Warren, to make the trip to the hospital, but when he came in a truck, the doctor explained that such a vehicle would not do at all.

Mr. Warren went to town and informed Sheriff Craig about the matter, and the sheriff went forthwith to the scene. Upon arrival, he saw Page a few steps in front of the south door, and his father, Will Page, was also there. Several others were in the house. The sheriff found the injured woman in the same condition as described by Dr. Creekmore. In addition, he observed that the covering over the window next to the bed was a

blanket, with splotches of blood on it. He found blood all over the kitchen—some had been washed up, but the floor was wet, and the water was still under the house. There were splotches of blood on the wall where some-one had tried to wash it off. There at the scene, the sheriff asked Page if he knew anything about it, and Page told him that he whipped his wife the night before with a broom. Thereupon .the sheriff observed a broom with two pieces broken off the handle, and asked Page if that was the broom used. Page replied that it was; that the reason it was broken was that, in whipping his wife, he struck it against a rafter, which caused the break. The sheriff retained the broom, arrested Page, and took him to jail.

As the woman was not dead when the sheriff left, when he got back to DeKalb later, he sent Dr. J. L. Hazey to see about her. When the doctor saw the woman about eight o'clock that evening, she was dead. He found a large tear, four to five inches in the left frontal . area, with a fracture of the skull beneath, and brain substance oozing out. There was a depression, with the skull bat-tered in and open, and with the white bone showing. The undertaker found two soft places and twenty-three bruises, and said the bruises appeared to have been made by an instrument like a poker or limb.

On the morning of Christmas day, Kid Townsend went to Page's house about 9:15. Page was sitting by a heater which had a fire in it, and his wife was lying in the bed with the cover over her. He saw no blanket over the window. Everything was neat, and there was nothing unusual. He saw nothing wrong with Annie Bell Page—she talked some. Joe Townsend and Dick Whitsey came up. Page had some whiskey and wine, and all of them took a drink. He was at the home about thirty minutes. To like effect was the evidence of Joe Townsend, who stayed at Page's house for about an hour. Neither did Adrian Taylor observe anything unusual, or see any

covering over the window. When he first arrived at the home, the woman was lying in the bed. But when he went out of the house for a few minutes and came back, Annie Bell Page was behind the heater, and told him that she was kind of sick, but not enough to go to a doctor. Later when he went back after twelve o'clock, Page came to the door, partly opened it, and told his companion, Eugene Cherry, that the friend, whom they were looking for, had gone.

About two o'clock in the afternoon, Page went to the home of Lena Odom, about a quarter of a mile away, and asked Luverta Townsend who was present, to lend him some money. He also made a like request of Otis C. Wilson, his brother-in-law, but without success. Page then went home, where he stayed a few minutes, came back, and called his brother-in-law out, and they left on a truck going toward DeKalb. Page was seen coming back with Dr. Creekmore. Of like effect was the evidence of Luverta Townsend, who said that no mention of any kind was made by Page about his wife.

Otis C. Wilson, Page's brother-in-law, corroborated the statements of Lena Odom and Luverta Townsend. He related that on the first trip, about 2:30 that afternoon, Page told Wilson that he might want Wilson to take him somewhere. After this, Page went home, stayed a few minutes, came back, called Wilson out and asked Wilson to take him to town to get a doctor for his wife; that she drank about a one-fifth of wine, fell out of the door and cut her head. He told no one else about this incident. After they had driven about two and one-half miles, Page appeared to be excited and told Wilson, ''You better kind of drive up, she is pretty serious''. Wilson put Page off at the door of Dr. Creekmore's office.

Buster Powell was at Page's home between three and four o'clock that afternoon. He saw the condition detailed by both Dr. Creekmore and the sheriff. In addition, he heard Page's sister say to him there at the

scene, "John Davis (Page), you have killed your wife, and if I was in your shape, I would take my own gun and shoot myself". To which accusation, Page said nothing.

Later, while in custody, Page freely and voluntarily admitted to the sheriff: That he whipped his wife because she was running around with Cleo Adams; that a slight cut which he had on the arm was caused by their scuffling over a screw driver; that his wife had hung the bloody blanket up on the window on Friday night, when he had beaten her; that he did not know how blood got on it; that he left his wife at home when he had gone up to Pearl Odom's house that afternoon; that he went back to tell her that he was going to David Stewart's; and when he got to the house, he found her in that condition. He was unable to account for the blood in the other parts of the house, because his wife was in the bedroom. Neither could he say why the blood was in the kitchen unless it was from his wife's dressing a rooster.

Appellant complains of a number of errors, which we will take up in the order assigned. The first of these is that the court erred in refusing his request for a peremptory instruction to find appellant not guilty, because, he says, the evidence was insufficient to warrant a conviction.

While a lengthy statement of the facts has already been given, a few comments thereon are pertinent. According to three witnesses, they were at appellant's home on the morning of the tragedy, from 9:00 until 10:30. While Annie Bell Page was in bed, they saw nothing unusual—there was no disarrangement—no blanket over the window next to the bed—no blood about the room—nothing to indicate a struggle—the woman sat up and talked some. Appellant alone was with her when they left. One of them returned just after twelve o'clock, when appellant came to the door, opened it partly, and said the other boys were gone. Thus appellant was with

his wife at that time. About two o'clock, appellant went to a nearby house to borrow some money. Failing in this, he returned to his home. Thus, he was with his wife at that time. In a few minutes, he returned to the neighbor's house, called out his brother-in-law, informed him that his wife had drunk about one-fifth of wine, had fallen out of the door and cut her head, and wanted his brother-in-law to drive him to town for Dr. Creekmore. He told no one else about this, although he was among friends. As they were going to town, appellant seemed to become excited, and urged his brother-in-law to drive up as his wife was in a pretty serious condition. When he asked the doctor to make the visit because his wife had fallen out the doorsteps and cut a little place on the front of her head, and was apprised by the doctor that he had to make another call first, appellant became insistent, and said his wife was in pretty bad shape. The doctor found the terrible situation which has been detailed above.

 Between 10:30 that morning and three to four that afternoon, there was a complete change in the condition of the house. A woman who had been able to get up and talk some, had been beaten into insensibility, and was in the throes of death. Her blood was spilled and spattered all about the house. One could not, with reason, attribute this condition to falling out doors, or out the doorsteps. And the appellant, apparently, was there at all times. He did not take the stand, as was his right, and deny either the circumstances arrayed by the State or the logical inferences therefrom. From all of these facts, therefore, it was a question for the jury as to whether or not the condition of the injured woman was the result of a criminal agency; and the appellant being the last person with her, whether or not, he was that criminal agent. Poore v. State, 205 Miss. 528, 37 So. (2d) 3 and 357; Dickins v. State, Miss., 43 So. (2d) 366, and authorities there cited.

But the State did not depend altogether on circumstantial evidence. Appellant claimed to his brother- in-law that his wife had drunk wine and fallen out doors; to Dr. Creekmore, that she had fallen out the doorsteps; to Sheriff Craig, that he whipped her with a broom the night before, because she had been running around with another man. When his sister told him that he had killed his wife, and if she were in his place, she would take a gun and shoot herself, he did not deny the accusation. He admitted trying to wash blood off of the outside wall. He could account for the blood in the kitchen only by saying that his wife had killed a rooster.

Appellant, in his brief, has cited a number of cases, with which we are in harmony and agreement. In our opinion, however, they have no application to the facts of this particular case.

Manifestly, this was a case for the jury, and the court was not in error in refusing the peremptory.

 The next assignment argued is alleged error of the court in overruling objections to statements made by third parties, and in refusing his motion for a mistrial because of alleged improper remarks of the District Attorney in argument to the jury.

The first of these statements was that of Buster Powell, who heard appellant's sister make an accusation against him at the scene, and which is set out in the statement of facts above. In other words, he made no denial of the accusation. This statement was competent and clearly admissible under the well known principle of admission by silence. 22 C. J. S., Criminal Law, Section 734, page 1258; Anderson v. State, 171 Miss. 41, 156 So. 645.

 The second of these statements was that of Will Page, father of appellant. In the absence of the jury, Sheriff Craig testified that, while he was at appellant's home, at the time he made the arrest, Will Page said to him in the presence and hearing of appellant, "Get John Davis Page, that is the man, and don't let

him hurt you", and that appellant said nothing. This was admissible for the same reason as the Buster Powell statement. See authorities, supra. The jury then returned, and the district attorney again asked the questions to show that the statement was in the presence and hearing of the appellant, all of which were properly answered just as when propounded in the absence of the jury. Thereupon, he asked the final question: " I say, did the defendant answer, make any denial at that time?" Whereupon, appellant objected on the ground of incompetency which was overruled. Appellant then immediately asked that the testimony be excluded and the jury admonished, which was overruled by the court. The witness never did answer that appellant said nothing, as had been shown in the absence of the jury. Evidently, in the warmth of the trial, the District Attorney overlooked the fact that the question had not been answered. And the court, being aware of what had been said out of the presence of the jury, and the final question as to what appellant said having been asked, assumed that the question would be answered, and therefore, overruled the objection. When the questioning went into another field, there was no renewal of the objection and motion to exclude. But for the objection, no doubt the witness would have answered as he had done in the absence of the jury, and the evidence would have been properly admitted. However, if the witness had changed his evidence so as to say that appellant denied the accusation, the court would have then had the opportunity to exclude the whole statement, the reason for its admissibility having disappeared. If there was error in this regard, we think the appellant precipitated it by his repeated and unnecessary objections, when they had already been preserved by objections in the absence of the jury, and that he may not now profit thereby.

The next complaint is as to alleged improper remarks of the District Attorney in argument to the jury.

Argument was being made by this official, when appellant's counsel objected to some statement, asked for a special bill of exceptions, that the jury be admonished, and for a mistrial. The objection was overruled. The trouble about this assignment is that the statement complained about does not appear in the record, and no special bill of exceptions was actually taken. Under such circumstances, we cannot notice it. Following this, when the District Attorney asked the court if he could finish his statement, he merely said, in effect, that either side could have put the father and sister of the appellant on the stand. We do not understand this to be criticism for failure of appellant to use them as witnesses. But see Brown v. State, 200 Miss. 881, 27 So. (2d) 838.

 The next error assigned is the admission of the broom in evidence. The answer to this is that the broom was obtained by the sheriff on his first trip to the appellant's home. At the time, the officer had good reason to believe that a felony, to wit, a homicide, had been committed. It appeared that the woman, under the circumstances, was the victim of foul play. The appellant was present. The broom was in the house at the immediate scene. When the sheriff asked appellant what had happened, he told the sheriff that he had whipped his wife with a broom. He not only did not object, but even gave the sheriff a clew; and when the sheriff got the broom, appellant promptly identified it as the broom which he had whipped his wife with, and explained why it was broken into three pieces. The broom was properly admitted.

 The next assignment goes to the evidence about a dress. The record shows that on the day after the killing, the sheriff went to the home of appellant, without a search warrant, at a time when the appellant was in jail, and obtained the blanket which was over the window, the window itself, and a dress out of a trunk in the house. The State offered the window and the blanket in evidence,

outside the presence of the jury, but objection thereto was sustained. The court was evidently following Lancaster v. State, 188 Miss. 374, 195 So. 320. The State did not offer the dress, but the court permitted Sheriff Craig to testify that appellant admitted that he placed the dress in the trunk; and the Sheriff said it had two holes in it and some blood on one sleeve. The sheriff also said that appellant denied that he punched the holes in it, and was unable to remember what he said about the blood on it. The sheriff had no right to search the trunk at that time without a search warrant. Lancaster v. State, supra. There was no claim anywhere in the evidence that the deceased was wearing the dress at the time, or subsequent to her injuries. If the object was to impeach the appellant's statement that he did not punch the two holes in the dress by showing that two holes were in it, this was such an infinitesimal error that it must be held to be harmless. The probative value of such a contradiction, when considered with the other statements, may be likened to a tiny mote as compared to a gigantic beam. Viewing the error in regard to a reference to the blood on the sleeve of the dress, again we must say that this should pale into insignificance, when we remember that there was blood about the house—blood about the person of the victim—blood on the bed—blood on the blanket in the window—blood on the floor—blood on the wall— blood in the adjoining room—blood in the kitchen. How could just a little more blood on the dress, procured illegally, add, in any measure to the harm or discomfiture of the appellant. In Cofer v. State, 152 Miss. 761, 118 So. 613, the shells were a highly important link in the chain of circumstances, and their admission was harmful and prejudicial. We have no such case here; and this case is clearly distinguished.

█ █ The next assignment goes to the alleged exhibition of incompetent exhibits before the jury. At the close of Sol Ruffin's testimony, appellant stated to the

court that the sheriff or a deputy had demonstrated before the jury clothing or bedding, without its competency being passed on by the court, and asked the court to admonish the jury not to consider the bedding, clothes or whatever it was that was brought into their presence, and asked for a mistrial. The court directed that the record show that no bedding or clothing had been exhibited to the jury so far as he knew. Counsel then asked for a special bill of exceptions, if the court did not see it. The court then stated that the sheriff or someone behind the judge, which is not in the presence of the jury, had something which looked like a blanket in his arms, but there had been no clothing, blankets or anything exhibited to the jury. The bill of exceptions, signed by two practicing attorneys, as provided by statute, says that the sheriff ''appeared in the presence, sight, and within a few feet of the jury panel with exhibits of bloody bedding and clothing before such articles had been passed upon as to the competency of the introduction thereof by the presiding judge''; that the judge had his back to the jury and did not see, nor could he have seen the same. Thus, the proof is that the sheriff had these articles in the presence, sight and a few feet from the jury. In other words, that they were exposed to view. But there is no proof that the jury actually saw the articles. When this incident occurred, and the motion was made, the record shows that the jury was still in the box—it had not been retired on request of appellant. And with the judge announcing then and there that no clothing blankets or anything had been exhibited to the jury, the judge was, in effect, saying to the jury, then in the box, that such things had nothing to do with the case. It is a matter of common knowledge that circuit judges, in qualifying juries in the trial of criminal cases, inquire of prospective jurors, in the event of their selection, if they will be governed by the evidence which comes from the witness stand, and the law given them in written instructions, and upon these two things alone, make up their verdict.

The voir dire examination confirms the adherence to this custom by the learned Judge below. It would have been such an easy matter, if appellant had asked for the jury to be retired, and then ascertained whether or not any juror had in fact seen the alleged articles. This should have been done. Before he even knew whether the jury had seen them or not, he called attention, and paraded it before the jury. We think the judge's statement, after the matter came up, eliminated the harm, if any had been done. But we must hold that if, in fact, any harm was done, appellant brought it on himself.

The last assignment complains of error of the lower court in overruling the motion for a new trial on acount of the alleged errors heretofore dealt with, and because the verdict of the jury was contrary to the law and the evidence.

In view of what has already been said, it will be seen that we have upheld the trial court in all these matters, and that we think the court committed no error in this respect.

Because of its brutality and barbarity, this case will not quickly fade out of the books. Our considered opinion is that the jury were not only warranted in finding the appellant guilty of the murder of his wife, but, in truth and in fact, any other conclusion was inescapable. His guilt was established beyond reasonable doubt, and to the exclusion of every other reasonable hypothesis than that of his guilt. He had a fair and impartial trial. No reversible errors were committed. The right result was reached.

Affirmed.