THURMOND *v.* STATE.

In Banc. June 11, 1951.

No. 37879 (53 So. (2d) 44)

**Edward J. Bogen** and **B. B. Wilkes,** for appellant.

**Hardy Lott** and **Means Johnston,** also for appellant.

**Joe T. Patterson**, Assistant Attorney General, for appellee.

40

**Alexander, J.**

This is an appeal from a conviction of murder. The jury saw fit to impose the extreme penalty.

The following facts may be accepted as without dispute. Appellant had been drinking steadily throughout the afternoon preceding the homicide. During the evening and up until the early hours of the following morning, he and his companions had traveled in his truck back and forth between several "night clubs" at which intoxicating liquors were bought and drunk. The last spot visited was the store of J. W. Willis. It was here that the homicide occurred.

The victim was C. C. McGough, the town marshal of Arcola, who was at Willis' place when appellant arrived. Some time between four and five a. m. Thurmond left the place and was followed shortly thereafter by the marshal who just before leaving had stated that he was going outside to try to induce appellant to go home. After a brief interval, the two "come around the house arguing . . . they were tussling and they fell and Mr. Thurmond got up and shot Mr. Buster (McGough) three times." Both were armed with pistols. After the two had fallen, appellant arose and shot McGough three times in the back of the body, neck and shoulder. McGough was lying "in a puddle of water" and was making no effort to resist or defend himself. Appellant had carried his pistol all the afternoon and evening and after the shooting.

There was testimony that McGough's pistol remained in its holster, but this point was beclouded by other testimony. However, there is no testimony of aggression

by the marshal, and witnesses said his pistol was in his holster after he was shot.

There was no plea or defense of justification. Although the State gratuitously procured instructions offering the loopholes of self-defense, and heat of passion, there was no testimony to support such defenses. Appellant did not testify.

The first three assignments are based upon the refusal of a peremptory charge and the insufficiency of the evidence. We find no support for these contentions.

The fourth assignment is directed toward the admission, over objection, of a statement made by the stricken officer to a doctor called to his aid. Dr Spaulding detailed the incident as follows: "I got up to Mr. McGough and asked him what the trouble was and he said Mr. Thurmond shot him and I asked him what was the trouble and he said Mr. Thurmond was drinking and he was trying to get him to go home or get somebody to drive him and Mr. Thurmond cursed him for everything he could think of and threw him in the ditch and shot him three times in the back."

This statement was not offered as part of the res gestae nor was it sought to be admitted as a dying declaration, although the dying officer stated "I don't mind dying but I don't want to die on this ground." Admission of this part of the statement of deceased is assigned for further error. It is enough to state that there was no objection to this expression. Indeed, it was brought out on cross-examination by the defendant. The supporting basis of the principal statement is that it was made in the presence and hearing of the accused and is admissible as an implied admission or confession. In this connection eyewitnesses placed the accused at distances estimated respectively at five feet, twelve feet, and "fifteen steps from the victim." Dr. Spaulding testified that in his opinion appellant heard the statement; that there was no noise or disturbance and "it was very

quiet." He referred also to a conversation with appellant at this time, including a statement that the latter "said he was going to drive his car." The witness could not say with certainty that the accused heard the accusations. There was no showing that accused was unable to hear and understand what was said.

 █ The doctrine that accusatory statements made in the presence and hearing of the defendant are admissible as confessions implied from silence is well established in our jurisprudence as an exception to the hearsay rule. Spivey v. State, 58 Miss. 858; Anderson v. State, 171 Miss. 41, 156 So. 645; Page v. State, 208 Miss. 347, 44 So. (2d) 459; Wigmore on Evidence, Vol. IV, Section 1071; McKelvey on Evidence, (5th Ed.), Section 128; Greenleaf on Evidence, Vol. I, Section 199; Wharton, Criminal Evidence, Vol. II, Section 656; Underhill, Criminal Evidence, (3rd Ed.), Section 208; 31 C. J. S., Evidence, Sec. 295; 22 id. Criminal Law, Section 734; 20 Am. Jur., Evidence, Sections 567, 570. See also Character v. State, Miss., 53 So. (2d) 41, this day decided.

It is not to be assumed, however, that the mere presence and hearing of the accused is always sufficient to authorize its admission. The circumstances must be taken into account and these involve all matters which affect the propriety or occasion for a denial, and the question whether a normal reaction would evoke protest. The test frequently is embodied in the generality that "the defendant is called upon to deny the statement." See Lewis v. State, 109 Miss. 586, 68 So. 785, where in a dictum the view was expressed that there was an absence of any obligation to deny an accusation made by a child of decedent.

 █ The issue whether a reply is indicated or called for is for the court, and it is for the jury to decide whether the statement was heard and understood. Wigmore, op. cit., supra, Vol. IV, page 74; 20 Am. Jur., Evidence, p. 485; 31 C. J. S., Evidence, Sec. 296, p. 1063. Compare

Kroger Grocery & Baking Company v. Harpole, 175 Miss. 227, 166 So. 335. ██ The testimonial quality of such testimony is not based upon its being offered as proof of a fact asserted but as a predicate to the showing of the reaction of the accused thereto. 20 Am. Jur. ubi supra. The conduct of the accused becomes thereby original evidence. McKelvey, ubi supra. We are unable to find error here.

██ The fifth assignment challenges the "admission of other crimes introduced by the State to impeach appellant's reputation." These instances arose upon cross-examination of certain character witnesses to the good character of appellant. They were asked, in substance whether they had heard rumors of some difficulty between accused and one Keith involving possession of a pistol by accused and his making of threats. These inquiries met no objection but on the contrary were made the subject of redirect examination by counsel for accused. No basis for error was thereby established.

██ The sixth assignment assails the first instruction for the State where it is asserted that the word "design" was omitted in the expression defining murder as involving a "deliberate (design)". A certified copy of the instruction properly drawn and showing the omission as a scrivener's error in the record has been sent up. We do not base our conclusion denying this assignment on such corrective device but upon the fact that throughout the many instructions for both the State and the appellant the proper phrase was employed.

██ The seventh assignment is directed to the following instruction given the State: "The court instructs the jury for the State that voluntary intoxication on the part of a slayer does not excuse a homicide, but that at most it reduces the degree of the crime from murder to manslaughter.

"The court further instructs the jury for the State that for voluntary intoxication on the part of the slayer to reduce a crime which would otherwise be murder to

manslaughter, it must be intoxication of such a degree as to render the slayer incapable of comprehending his relation to others, incapable of formulating an intent to kill, and unconscious of the nature and probable consequences of his act.'' The first paragraph of this charge is favorable to the appellant. We can not approve the latter paragraph whereby intoxication which rendered the accused ''incapable of formulating an intent to kill'' would reduce to manslaughter what would otherwise be murder. Yet, the State's instruction next following follows the same pattern and fixes as the test ''intoxication of such a degree as to render the slayer incapable of forming a deliberate design and intent to kill''. An additional charge repeated the ingredient of ''deliberate design'' as essential. Moreover, several instructions for the appellant bound the jury to a duty to find the existence of ''malice aforethought'' as the specific essential intent, also ''an unlawful intentional and malicious killing,'' ''premeditation and deliberation'', ''deliberate purpose to kill'', and ''a condition of sobriety at the very instant of the shooting as to enable him (the defendant) to premeditate and deliberately form the specific intent to unlawfully, feloniously and of his malice aforethought to kill and murder McGough.'' There were instructions requested by and given to appellant which followed the pattern of the instruction attacked and required merely an inability to ''form an intent to take life'', to depress the crime from murder to manslaughter.

While the conduct and actions of the accused would seem to disclose no mental aberration sufficient to prevent the formation of a deliberate design to kill, such a finding is not for us to make. However, the jury had before it testimony showing one whose hand was armed with a pistol and whose powers of restraint were disarmed with continual drinking, yet who drove his truck back and forth during the afternoon and evening and evidently away from the scene of the homicide, and who was able to throw his victim into a ditch and shoot him thrice with

tragic accuracy, and who, when arrested after leaving the scene, sought to draw his pistol against the arresting officer. It is from such objective circumstances interpreted under the guidance of common experience and knowledge that the jury were required to act. As stated, there is no subjective revelation by the appellant of any justification or mental incapacity. The jury did not see fit to place upon his own lips a denial of mental capacity or to conjure up for him a passion whose fervor dethroned his reason, and thereby mitigate his crime.

Cases are abundant which deny to an accused any defense based upon voluntary intoxication. We have so held, beginning with Kelly v. State, 11 Miss. 518, and through other decisions, culminating in Melton v. State, 155 Miss. 659, 124 So. 802, where it was stated: "The record shows that, while the deceased was attempting to do a friendly act towards appellant, and without any reason on the part of anybody there present to suspect danger, appellant suddenly announced with an oath that he was going to kill deceased, and immediately shot him. Upon such a record we would be at a loss how or where to draw a line between partial intoxication, and the so-called complete intoxication. The dangerous ground that would be entered upon in the attempt to draw such a line admonishes us against the venture, and compels us to remain within the established doctrine that voluntary intoxication is no defense." And the following statement from People v. Rogers, 18 N. Y. 9, 18, was quoted with approval: "Such a principle is absolutely essential to the protection of life and property. In the forum of conscience there is no doubt considerable difference between a murder deliberately planned and executed by a person of unclouded intellect, and the reckless taking of life by one infuriated by intoxication; but human laws are based upon considerations of policy, and look rather to the maintenance of personal security and social order, than to an accurate discrimination as to the moral qualities of individual conduct. But there is, in truth, no injustice in

holding a person responsible for his acts committed in a state of voluntary intoxication. It is a duty which every one owes to his fellowmen and to society, to say nothing of more solemn obligations, to preserve, so far as it lies in his own power, the inestimable gift of reason. If it is perverted or destroyed by fixed disease, though brought on by his own vices, the law holds him not accountable. But if by a voluntary act he temporarily casts off the restraints of reason and conscience, no wrong is done him if he is considered answerable for any injury which in that state he may do to others or to society.'' We are aware of course that these cases did not deal with convictions of murder. We are not called upon to analyze trends which find exceptions in cases where the degree of intoxication is totally disabling or those which apply the tests applicable to the defense of insanity. We have assumed, without deciding, that there must exist a capacity to form a deliberate design to effect death, and it is enough that such a test was submitted to the jury. Their finding of guilt of murder by this test is based upon substantial testimony. Nor is it our province to question its peculiar prerogative and duty to fix the degree of punishment. We can go no further than examine whether there be error in law or fact in submitting to the jury the issue of murder. After a careful and protracted consideration of the entire case in full consciousness of our solemn duty both to the law and to this appellant, we have been unable to find any reversible error.

The judgment is affirmed, and Friday, August 3, 1951, is fixed as the date for execution of the sentence so imposed.

Affirmed.