## CONN *v.* STATE

| No. 40075 | October 15, 1956 | 89 So. 2d 840 |

834

*W. D. Womack,* Belzoni, for appellant.

836

*J. R. Griffin,* Asst. Atty. Gen., Jackson, for appellee.

KYLE, J.

The appellant, Robert Conn, was jointly indicted, along with Hobson P. Jones and Carl Matthews, at the November 1952 Term of the Circuit Court of Hinds County, on a charge of grand larceny in the taking, stealing and carrying away of $300 in money, being the property of L. C. Lipscomb. A severance was granted to each of the defendants, and the appellant was tried at the September 1955 Term of the Court, and was convicted and sentenced to serve a term of two years in the state penitentiary. From that judgment he prosecutes this appeal.

The testimony of the State's witnesses made out a case of "pigeon dropping." Four witnesses testified for the State. The defendant offered no testimony on his own behalf.

Jake Terleton, colored, testified that he lived at Port Gibson and ran a night club for members of the colored race. He knew Carl Matthews prior to 1952, but had never known Robert Conn or Hobson Jones until sometime during the month of June 1952 when they came to see him at his home in Port Gibson. Matthews and Conn came together, and Matthews asked Jake if he wanted to go into "a deal of business." Jake told Matthews that he did not know what he was talking about, and Matthews said that he had a man who would show him. Matthews then left the house and came back about ten

minutes later with Mr. Jones. Jones had a small handbag or suit case in his hand. He told Jake that he could "make some money." Jones then put a five-dollar bill between two pieces of paper about the size of the five-dollar bill, and rolled it on the table. He then dropped the roll in a bowl and filled the bowl half full of water and dropped some pills in it, which caused the water to boil up. He then took the two pieces of paper out of the bowl of water, twisted them and hung them over a light and dried them and said, "That's what I can do." Jones asked Jake whether he would be interested, and Jake told him that he did not think he would be interested. Jones told Jake that it would take around a thousand dollars "to be interested." He then told Jake that he was going to Utica. Jones went to Utica and called Jake on the telephone about 10:00 o'clock that night; and Jake finally told him that he might be up there in the morning, around 9:00 o'clock.

Jake testified that he went to Utica the next morning and carried L. C. Lipscomb with him. L. C. was his stepson. Jake told L. C. that Mr. Matthews had a deal on, and "I want you to go up there with me to see what we can do about it." Jake had $200 in money in his pocket and L. C. had $300. Jake and L. C. drove to the depot at Utica, and Matthews and Conn met them there. Matthews told Jake that the man they wanted to see had gone to Jackson, and Jake, L. C. Matthews and Conn then got in Jake's car and drove to Jackson. They parked their car on the north side of the Robert E. Lee Hotel, and Conn got out of the car and went into the hotel and returned shortly thereafter with Jones. Jones asked L. C. if he knew what the plan was. L. C. said, "No," and Jones then said, "Well, Mr. Matthews will tell you." Matthews then told L. C. what the deal was; and Jones said to Jake and L. C., "We are going to give you three for one. It will be good money." L. C. asked Jones how he knew it would be good money, and Jones said, "I will

go down to the bank with you and I will cash it in and let you know that it will be good, it will be three to one good money.'' L. C. then told Jones that he had $300 to invest, and Matthews told him that he had $200. Matthews then gave Jones his $200; Jake gave Jones $200; and L. C. gave Jones his $300. Conn was present during the entire transaction. Jones then went back to the hotel, and did not return immediately. After a time Matthews went into the hotel to see what Jones was doing. He came back and said that Mr. Jones was eating dinner and would be down directly. But Jones did not return. Conn told Jake and L. C. that he had seen some cops around the hotel, and then said, ''We had better leave from around here.'' Conn, Jake, and L. C. then left the hotel and drove to the railway depot. Matthews did not go with them. When they got to the depot Conn said that he would go inside and see if he could find out what had happened—presumably, find out what had happened to Mr. Jones; and Jake and L. C. did not see Conn any more. About an hour later Jake and L. C. drove back to the hotel and picked up Matthews, and Jake, L. C. and Matthews drove back to Utica. They found Conn's car at Utica and got the number off of the car. They waited around there about an hour, thinking that Conn would come back to Utica to get his car. But Conn did not come back. A lady got in Conn's car and drove off. Jake, L. C. and Matthews drove back to Jackson about midnight, and Jake and L. C. reported their loss to the police department the next morning. Matthews went with them to the police station. Jones and Conn were picked up by the police sometime thereafter, and Jake and L. C. saw Jones and Conn in a line-up at the police station the day after the filing of their complaint.

L. C. Lipscomb's testimony was substantially the same as that of Jake Terleton. Lipscomb testified, however, that he had marked the bills that he paid to Jones, two $100 bills and two $50 bills, with red ink; and that Mr.

Jones told him, "The deal is, I just want to use your money to take the numbers off of it. * * * You get your money back plus three for one, and good money." Lipscomb also testified that after he and Jake had reported their loss to the police department and Jones and Conn had been arrested he saw Jones and Conn in the line-up at the police station and recognized both of them.

Carl Matthews, who had been jointly indicted with Jones and Conn, testified as a witness for the State. Matthews testified that he had known Conn about twenty years, but he did not know Jones prior to June 1952. He had known Jake Terleton six or seven years, and he had known L. C. Lipscomb about three years. Matthews testified that Conn and Jones came to Utica and asked him if he knew where they could find "a prospect." They told him they would rather have a colored prospect. Matthews stated that he did not know exactly what they meant when they said "prospect," and they did not explain their plan to him; but he decided to help them out. He expected to get something out of it, and they told him that he would get something out of it. For that reason he decided to take them to Port Gibson to see Jake and L. C. Matthews, Jones and Conn went to Port Gibson and found Jake at Jake's Grocery Store. They then went to Jake's house to discuss the matter. When they got to Jake's house, Matthews stayed out in the car, and Matthews did not know what took place in the house.

Matthews stated that Jake and L. C. came to Utica the next day and met Conn and Matthews at the depot. They then drove to Jackson in L. C.'s care to "make the trade," and stopped the car at the Robert E. Lee Hotel. Jones came out to the car and asked them if they were ready to do business. Matthews testified that he had $200 in money which had been given to him by Conn while they were in Utica, which he was to turn over to Jones "to buy in on the deal." He gave the $200 to Jones, and Jake and L. C. gave their money to Jones. Jones then

went back into the hotel, and Matthews did not see him any more that day, nor did he expect to see Jones any more that day. But he met Jones and Conn by appointment the next afternoon at the Green Derby, on U. S. Highway 80 West; and they gave him his part of the split, which amounted to $150. Jones had told him that if they made any money, they would split it three ways, and Matthews' part of the $500 which Jones had received from Jake and L. C. was $150. Matthews stated that he owed some debts and paid them and had about $40 left when he was picked up by the police two or three days later. He stated that he went to the police station with Jake and L. C. when they filed their complaint, and after he was picked up by the police he confessed his participation in the "pigeon dropping" scheme. He saw Jones and Conn at the police station but did not remember whether he told his story in their presence or not.

R. T. Foster, a detective from the police department of the City of Jackson, testified that he was called into the case on Wednesday, June 25, 1952; that Conn and Jones were arrested on June 27 and were placed in a line-up at the police station and carried up stairs, where L. C. Lipscomb and Jake Terleton were waiting to identify them; and that after the line-up was broken up they were carried down stairs to an interrogation room. Foster stated that Matthews, who had not been placed under arrest at that time, was then called in and made a statement to him in the presence of Jones and Conn and one other member of the police force, and over the objection of the defendant's attorney Foster related to the jury the details of the statement made to him by Matthews in the presence of Jones and Conn in the police station. The statement which Foster testified that Matthews had made to him was substantially the same as the statement which Matthews had made to the jury while he was on the witness stand. Foster testified that Conn and Jones neither admitted nor denied the truthfulness of the statement.

At the conclusion of the evidence the defendant moved for a directed verdict. The court overruled the motion. The defendant, as stated above, offered no testimony in his own behalf, and he did not testify himself.

██ █ The first point argued by the appellant's attorneys as ground for reversal on this appeal is that the State failed to prove the corpus delicti of the crime charged beyond a reasonable doubt. But we think there is no merit in this contention. The evidence in the case shows that Jones obtained possession of Lipscomb's $300 fraudulently; that Lipscomb had no intention of parting with the ownership or legal title to the money when he delivered it to Jones upon Jones' representation that he only wanted to take the numbers off of it, and that Lipscomb would get his money back "plus three for one in good money." It is clear that Jones obtained possession of the money with the intention of depriving Lipscomb of his property, and that he did deprive Lipscomb of his property pursuant to that intent.

██ █ It is well-settled by the decisions of this Court that where the possession of personal property is fraudulently obtained, there being no intention on the part of the owner that ownership or legal title shall thereby pass, and the person who obtains possession intends to deprive the owner of said property, and in pursuance of such intent does deprive the owner thereof, the offense is larceny. Hanna v. State, 168 Miss. 352, 151 So. 370; Dukes v. State, 181 Miss. 704, 181 So. 518; Ware v. State, 186 Miss. 533, 191 So. 678; and Jones v. State, 223 Miss. 812, 79 So. 2d 273.

It is next argued that, although it may be admitted that Jake Terleton and L. C. Lipscomb were "bilked out of $500.00" in a confidence game, the record fails to show that the appellant Conn participated in the confidence game, and that the verdict of the jury convicting Conn as a codefendant is against the overwhelming weight of the evidence.

■■ ■ But the rule is well-settled that, "if property is feloniously taken from its owner pursuant to a conspiracy to commit larceny, the conspirators are all principals and the acts of one in furtherance of the common design are the acts of all." 32 Am. Jur. 947, Larceny, par. 49. The record in this case shows that Conn accompanied Jones to Utica, where they had their first interview with Matthews, who was personally acquainted with Conn, but not with Jones, and requested Matthews to help them locate a "prospect." The record also shows that Conn accompanied Jones and Matthews to Port Gibson, where Jones interviewed Jake for the purpose of interesting him in the "deal of business;" that Conn and Matthews met Jake and L. C. at Utica the next morning and accompanied them to Jackson; that Conn gave Matthews the $200 that Matthews handed over to Jones in the presence of Jake and L. C., to make it appear that Matthews was putting some of his money up "to buy in on the deal;" and that Conn was present when Jake and L. C. handed over to Jones their $500, which they were to get back, "plus three for one." Conn was present at the Green Derby when Matthews received his one-third part of the split. ■■ ■ We think there was ample evidence to show that Jones and Conn conspired together to commit the larceny, and that Conn aided and abetted in the commission of the crime.

Finally, it is argued that the court erred in permitting Detective Foster to testify concerning the accusatory statement made by Carl Matthews to Foster in the presence of Jones and Conn in the police station a few hours after their arrest.

■■ ■ The rule governing the admissibility of accusatory statements made by a conspirator or a codefendant after the commission of the crime and in the presence of the defendant on trial is stated in 22 C.J.S., p. 1309, Criminal Law, par. 768 a, as follows:

"Acts or statements by one conspirator or codefendant, although done or made after the termination of the conspiracy, are competent against another conspirator or co-defendant where they were done or made in his presence and he assented thereto; or where, in some other way, he acted in an incriminatory manner in connection with the transaction. * * * However, evidence of an act or statement of a co-conspirator or codefendant is inadmissible even though done or made in the presence of accused where he denies it.

"The necessary assent of accused may be either express or an implied acquiescence, and may be evidenced by a direct admission of the truth of the statement; by a failure to deny its truth where the circumstances are such as to make it reasonable to suppose that, if the statement were untrue, he would have denied it; or by the subsequent making, by accused, of statements practically the same as those made by the co-conspirator or codefendant.

"It is not sufficient that the statement was made in the presence of accused against whom it is sought to be used, even though he remained silent; but it is further necessary that the circumstances should have been such as to call for a denial on his part, and to afford him an opportunity to make it."

In Thurmond v. State, 212 Miss. 36, 53 So. 2d 44, the Court said:

"The doctrine that accusatory statements made in the presence and hearing of the defendant are admissible as confessions implied from silence is well established in our jurisprudence as an exception to the hearsay rule. * * * It is not to be assumed, however, that the mere presence and hearing of the accused is always sufficient to authorize its admission. The circumstances must be taken into account and these involve all matters which affect the propriety or occa-

sion for a denial, and the question whether a normal reaction would evoke protest. The test frequently is embodied in the generality that 'the defendant is called upon to deny the statement.' * * * The issue whether a reply is indicated or called for is for the court, and it is for the jury to decide whether the statement was heard and understood.'' See also, Anderson v. State, 171 Miss. 41, 156 So. 654; Jones v. State, 228 Miss. 296, 87 So. 2d 573.

▆▆ We think that the verbal statement of Matthews to Detective Foster should not have been admitted in evidence under the circumstances testified to by Foster. The accusatory statement was made by Matthews to the detective at the police station in the presence of Jones and Conn while they were under arrest, and at a time and under circumstances which precluded any real opportunity for the appellant to make a reply, had he wished to make such reply. The appellant was not asked, after Matthews made his statement, whether the statement was true or not, or whether he had anything to say in answer to the statement; and the manner in which the examination of Matthews had been conducted was such as to put the appellant on guard against making any voluntary statement that might be used against him later. Matthews had not been arrested. He had been merely called in apparently for the purpose of having him make his accusatory statement in the presence of the accused. The appellant was under no duty to make any statement to the officers concerning the crime with which he was charged, and we do not think Matthews' statement was made under such cricumstances as naturally to call for a reply. Mere silence on the part of the appellant under such circumstances, in our opinion, did not signify assent or constitute an admission of guilt.

▆▆ We are of the opinion, however, that the admission of Foster's testimony relative to Matthews' statement, under the facts disclosed by the record, does not

constitute sufficient grounds for a reversal of the judgment of the lower court. The statement that Matthews had made to Foster was in all its essential details the same as the statement that Matthews made to the jury while he was on the witness stand; and Matthews was subjected to a rigorous cross-examination concerning the facts testified to by him. The proof of appellant's guilt was conclusive, and if there was error in the admission of Foster's testimony concerning the accusatory statement made to him by Matthews, such error was harmless.

The judgment of the lower court is therefore affirmed.

Affirmed.

*McGehee, C. J.,* and *Arrington, Ethridge* and *Gillespie, JJ.,* concur.