302 So.2d 254 (1974)
Thomas Edward NORMAN, a/k/a Hekima Ana
v.
STATE of Mississippi.
No. 48096.
Supreme Court of Mississippi.
October 28, 1974.
*256 Anderson, Banks, Nichols & Leventhal, Jackson, Jonathan Shapiro, Boston, for appellant.
A.F. Summer, Atty. Gen., by Karen Gilfoy and John C. Underwood, Jr., Special Asst. Attys. Gen., Jackson, for appellee.
BROOM, Justice:
A guilty verdict and sentence of life imprisonment resulted from appellant's murder trial in the Circuit Court of the First Judicial District of Hinds County. We affirm.
The chief propositions before us deal with the law pertinent to arrest, search and seizure, admissibility of evidence, sufficiency of evidence to establish a jury issue as to murder, and alleged erroneous cross-examination of defense witnesses.
A "shoot-out" occurred at a dwelling house at 1148 Lewis Street in Jackson, Mississippi, where officers arrested appellant after he shot Jackson Police Lieutenant Skinner. Approximately thirty FBI agents and city policemen surrounded the house on August 18, 1971 to arrest Jerry Steiner, Henry Hatches, Jesse Nicholson and Larry (last name unknown). The Jackson FBI office received from its Detroit office a teletype that a federal arrest warrant had been issued for Steiner. A confidential informant advised the Jackson FBI that Steiner was seen at the Lewis Street house on August 17, 1971. Arrest warrants for Hatches, Nicholson and Larry had been issued by the Jackson authorities and were in possession of the lawmen.
The armed lawmen were equipped with tear gas guns, bulletproof vests, gas masks, and had available an armored vehicle parked nearby. Shortly after their arrival at the house, FBI Special Agent Sammon, using an electronic megaphone, announced that the lawmen were armed FBI agents and policemen, and had the house surrounded. He also announced that they had warrants for house occupants, and ordered them to come out unarmed within sixty seconds. Then he counted down the time at ten second intervals. When the sixty seconds period expired, Sammon announced that gas would be used if no one came out. After waiting an additional time interval, FBI Agent Linberg gave the order to fire gas into the building. Two FBI agents then fired gas into the house from opposite sides, and the response was gunfire which came from the front area of the house.
Officer Taylor, stationed in front of the house, saw Lieutenant Skinner fall (mortally wounded) immediately following the gunfire from inside the house. The lawmen returned the fire and within twenty minutes or less seven persons (including appellant) came out from under the rear of the house. They were arrested, searched, and asked general on the scene security type questions. After being advised of their rights, they were questioned in detail as further discussed in this opinion.
After shooting tear gas into the house, Officers Agnew, Amann, and Addy entered and found several weapons (including a partially concealed .35 caliber lever action rifle) which they removed. Appellant's fingerprint was found on and removed from the rifle. While inside the house, discovery of what appeared to be two bombs caused the lawmen to delay further search and required a call for the bomb squad to deal with the bombs. The house was kept under constant guard while an army bomb squad came and removed the bomb devices. Officer Copeland then resumed *257 search of the house and found inside various articles subsequently introduced into evidence. From inside he made certain sightings and observations which led to the recovery of a slug and bullet across the street.
Before the raid was made, the FBI had information: That weapons and ammunition were kept at the house by its occupants and that the weapons on occasion had been pointed at police officers; that Steiner was wanted for murder and believed to be dangerous; and, that the 1148 Lewis Street address was headquarters of a black separatist organization, the Republic of New Africa (RNA). After the shooting episode was over, none of the subjects were found there except Larry Jackson, for whom the police had a warrant for assault and battery.
Appellant's version was that he and his wife were simply on an overnight visit at 1148 Lewis Street. He testified that they were abruptly awakened, and that he fired because he "just generally felt that I was gonna be killed... ." Appellant also told the jury that, along with the other occupants of the house, they all surrendered, after which they were abused, gassed, and threatened.

I.
Appellant challenges the admission into evidence of items which were seized by the officers at 1148 Lewis Street. He argues that the seizure was in violation of rights guaranteed him by section 23 of the Mississippi Constitution, and by the Fourth and Fourteenth Amendments to the United States Constitution.
A substantial part of the state's case against appellant was based upon evidence that resulted from a search of 1148 Lewis Street following the arrest of appellant and the other occupants. This search yielded the .35 caliber Marlin rifle upon which appellant's palm print was found (which the state contended was the weapon which fired the fatal bullet), and the two Remington-Peters shell casings from which .35 caliber bullets had been fired. Testimony also resulted from the search that there was no other .35 caliber rifle in the house, that two .35 caliber bullets had been fired from a window in the southeast corner of the house, and that the shots fired from this position had caused two nickel-sized holes in the screen on the porch. Observations made by state's witnesses in the course of the search led directly to the discovery of a bullet in the wall and one on the windowsill of the house at 1143 Lewis Street, one of which was a.35 caliber bullet which the state contended was the fatal one.
Appellant sought by written motion to suppress "any and all items" seized at the house on August 18, 1971. His motion charged that the items were seized without a warrant in connection with his unlawful arrest. The motion was not properly before the court because appellant did not enumerate or describe or particularize the articles which he desired to suppress as evidence, and he failed to identify the objects at the evidentiary hearing on the motion. In this posture the trial judge properly denied the motion. O'Neal v. United States, 95 U.S.App.D.C. 386, 222 F.2d 411 (1955). Obviously some of the articles of evidence were clearly admissible. For example, the alleged murder weapon (picked up by the officers) was observed and in plain view of the officers during their initial precautionary search of the house. In this situation the trial judge was put in a position which called for the suppression of either all of the articles seized at Lewis Street or none of them. He correctly overruled the motion.
The general rule is that searches conducted without a warrant are unreasonable in the law even though a subsequent assessment of the situation may reveal that there was probable cause for the search. Nevertheless, a search may be made as an incident to an arrest, or items may be seized as a result of a cursory viewing of the area for persons or weapons which might *258 present a security risk to the officers. Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); United States v. Looney, 481 F.2d 31 (5th Cir.1973); Carlton v. Estelle, 480 F.2d 759 (5th Cir.1973); Creighton v. United States, 132 U.S.App.D.C. 115, 406 F.2d 651 (1969); Hall v. State, Miss., 288 So.2d 850 (1974). In the case before us, the .35 caliber lever action rifle was seized during the officers' initial inspection of the house and was admissible as an exception to the general rule. Harris, supra; Looney, supra; Carlton, supra; Hall, supra. As said in Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), the Fourth Amendment does not require a police officer to delay in the course of an investigation if to do so would gravely endanger his life or the lives of others.
Several of the items in controversy here were not seized by the officers when they initially entered the house, but were seized sometime later that day after the subjects had been arrested. Ordinarily, a subsequent reentry and seizure of items after the lapse of unreasonable time renders such items inadmissible in evidence. However, in this case, the delay was occasioned by discovery of bomb devices, at which time the search was not completed until the bomb squad came and removed the bombs. While waiting for the bomb squad, officers maintained a status quo by keeping the house under constant guard and surveillance. Then the search incident to the arrest was completed and other evidentiary items taken. There was not shown any unreasonable lapse of time between the arrest of the appellant (and the immediate search incidental to the arrest), and completion of the search after removal of the bombs. The final portion of the search after reentry was merely a continuation of the original search, and cannot be considered unreasonable in any legal sense. Voss v. State, 198 Tenn. 135, 278 S.W.2d 667 (1955), cert. denied, 348 U.S. 965, 75 S.Ct. 526, 99 L.Ed. 752 (1955). Our holding here is not in conflict with our decision rendered in the case of Page v. State, 208 Miss. 347, 44 So.2d 459 (1950). In the present case none of the evidence seized on the following day, August 19, 1971, was offered or placed in evidence against the appellant.
As stated by the court in Pendergraft v. State, 213 So.2d 560 (Miss. 1968), appeal dismissed, 394 U.S. 715, 89 S.Ct. 1453, 22 L.Ed.2d 671 (1969), investigating officers "would have been derelict in their duty if they had not been alert and observant in investigating" a homicide, and it was their duty to follow "up every lead they ran across." The question of whether a search is reasonable cannot be determined by any fixed formula and the Constitution does not define what are "unreasonable" searches. Reasonableness of searches must be resolved upon the facts and circumstances of each case.

II.
Appellant also urges that the admission into evidence of incriminating statements made by him violated his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In issue are statements made by appellant immediately after he emerged from the rear of the house at 1148 Lewis Street. Shortly after the group was arrested they, as a group, were asked general questions, including whether anyone else was in the house, to which appellant responded "No." Appellant answered negatively to the question if he had anything on him when he was being searched, and made no answer to the general question directed at the group as to who was firing the automatic weapon. When the group was asked who fired, appellant responded, "We all did," and said that he fired "from the side of the house."
Since the appellant's statements were made in response to general questions, there was not an inquisitorial "interrogation" but merely action taken in the interest of security.
*259 As said by the Supreme Court of New Jersey in State v. Barnes, 54 N.J. 1, 252 A.2d 398 (1969), cert. denied, 396 U.S. 1029, 90 S.Ct. 580, 24 L.Ed.2d 525 (1970), the Miranda decision comprehended the "process of `custodial interrogation' which the Supreme Court found to be inherently coercive... . blameworthiness on the defendant." Here, as in Barnes, the type of question complained of was not centered on defendant's "blameworthiness," and such general on the scene questioning is a well recognized exception to the Miranda rule. Dean v. State, 300 So.2d 797 (Miss. 1974); Ford v. State, 226 So.2d 378 (Miss. 1969); Weissinger v. State, 218 So.2d 432 (Miss. 1969); Nevels v. State, 216 So.2d 529 (Miss. 1968).
Appellant's argument concerning statements made by him after he and the other occupants of the house were brought to the front at 1148 Lewis Street is without merit. Abundant testimony before the trial court demonstrated that the statements then elicited by officers questioning appellant were freely and voluntarily given after FBI Agent Holder had advised appellant of his rights. It was only then that appellant was asked specific questions of an incriminating nature, and he responsively stated that he fired a British 303 rifle from the front of the house, in the screened porch area. He also stated that he had seen a police vehicle outside with a revolving blue light on it. Appellant did not deny making these statements. He not only admitted on direct examination that he did make them, but testified that he did fire from the southeast room of the house.
The trial court found upon adequate testimony at an evidentiary hearing that the appellant's incriminating answers to specific questions were freely, voluntarily and intelligently given after he was adequately advised of his rights, and after he waived his right to the presence of an attorney. United States v. Cavallino, 498 F.2d 1200, (5th Cir.1974); United States v. Montos, 421 F.2d 215 (5th Cir.1970), cert. denied, 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532 (1970); Morgan v. United States, 405 F.2d 497 (5th Cir.1969); Spurlin v. State, 218 So.2d 876 (Miss. 1969).

III.
Appellant argues that the court erroneously admitted into evidence irrelevant and highly prejudicial testimony founded on hearsay concerning activities of the RNA and certain of its members. There is no merit in this part of his argument because he made no objection to most of such testimony. Portions of the testimony, including that regarding the murder charges which had been previously lodged against Steiner, brought a response from defense counsel in the form of a simple "objection" without specifying any ground for the objection. The rule is that when counsel objects to evidence, he must point out to the trial judge the specific reason for or the ground of the objection or else the objection is waived. Stringer v. State, 279 So.2d 156 (Miss. 1973). This is not contrary to Nash v. State, 253 Miss. 715, 178 So.2d 867 (1965), where the court said that the several general objections raised by defense counsel and the request for a "continuing objection" properly preserved the error of improperly admitted evidence. In Nash the evidence complained of was not admissible for any purpose, but in the case before us (except for the hearsay characteristics) the evidence had ingredients of relevancy by showing why the FBI and other officers took extensive precautions in planning the arrest of Steiner.
Appellant posed no objection whatever when FBI Agent Linberg testified about a murder at Battle Creek, Michigan, in which the victim had been shot in the back of the head. Without objection, Linberg testified that a police officer in Detroit had been attacked by the RNA, which group the witness considered to be "black extremists." When Linberg referred to *260 the RNA Headquarters as an armed camp, appellant made a mere general "objection" followed by the query: "Is that a statement or is that information?" Counsel then apparently withdrew his objection and stated, "Very well. We will take care of it on re-cross." The trial court very properly sustained defense counsel's objection to the testimony given by Linberg that the FBI had information that the leader of the RNA had threatened to wipe out the Mississippi National Guard and instructed the jury to disregard it. Then when the question came up again on redirect examination of Linberg, no objection whatever was made to similar testimony.
Without any objection, Chief of Police Tullos gave testimony that the occupants of 1148 Lewis Street were armed, and had pointed weapons at police officers in the past. He also testified without objection that police intelligence indicated that twenty-four hour guards had been posted in front of the house and that guns had been pointed at the gas meter reader. Tullos' testimony concerning a statement made by the President of the RNA that "the officers that made the arrest was (sic) in the cross-hairs of a rifle," was not elicited by the state, but resulted from cross-examination of Tullos by defense counsel. Only a general objection was made by defense counsel to the quoted testimony. The second question prior to that which elicited such testimony was a question in which defense counsel was interrogating Tullos about the "danger" in effecting two prior arrests of RNA members. Thus the testimony about "cross-hairs" of a rifle was not entirely unresponsive to the line of questioning employed by counsel in cross-examining Tullos.
As noted previously, the testimony complained of has qualities of relevance. By such testimony the state was seeking to establish the reasons for the precautions used by the police in their Lewis Street "raid." While parts of the testimony may have been hearsay, most of it was not objected to at all, and that which was objected to was by mere general objections without any statement of the grounds for the objections. The appellant thereby waived the ground of objection argued here.

IV.
Appellant contends that the homicide was justifiable because he was resisting an unlawful arrest and reasonably believed himself to be in imminent danger of great bodily harm. He relies upon Mississippi Code Annotated section 97-3-15 (e) and (f) (1972). In this state an officer with an arrest warrant has the authority to enter and search a dwelling when he acts upon probable cause and reasonable belief that the party whom he seeks to arrest is in such a house. Miss. Code Ann. § 99-3-11 (1972); 18 U.S.C.A. § 3109 (1969); Monette v. Toney, 119 Miss. 846, 81 So. 593 (1919).
It was stipulated that the officers had warrants for four people. Additionally, the officers testified that they had information that the four subjects of the arrest warrants were staying at 1148 Lewis Street. The arrest warrants in this case were not issued on any informant's tip, but were issued in response to affidavits charging the subjects with crimes. The tip in question concerned only the whereabouts of the four subjects of the arrest warrant. According to the record, the informant had given the officers previous information which had been verified in the past as truthful. The informant specifically told the officers that Jerry Steiner had been living at the address since July, and that he had seen Steiner there on August 17, one day before the episode. Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); Aguilar v. State of Tex., 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Barker v. State, 241 So.2d 355 (Miss. 1970); Strode v. State, 231 So.2d 779 (Miss. 1970). Accordingly, the officers in this case had sufficient cause to believe that the fugitives could be located there.
*261 In this case the lawmen fired gas into the house only after a reasonable time had elapsed in relation to the existing circumstances, following the announcements requesting the occupants to vacate the house. According to the lawmen, after they made the announcements they heard activity in the house and saw movement inside. The exigencies confronting the lawmen were sufficient to justify their action. Failure of the house occupants to exit as requested by means of the megaphone demonstrated their refusal to cooperate with the arresting officers who had identified themselves and stated their purpose. Rodriguez v. Jones, 473 F.2d 599 (5th Cir.1973), cert. denied, 412 U.S. 953, 93 S.Ct. 3023, 37 L.Ed. 1007 (1973); United States v. Woodring, 444 F.2d 749 (9th Cir.1971). At the time the occupants refused to cooperate, the officers were warranted in using reasonable force and means to execute the arrest warrants. The record does not show that any unreasonable force and means were used by the officers. The officers in this case had prior information that they were arresting a dangerous subject (Steiner) in what they had reason to believe was an armed camp.
Upon the facts and circumstances of this case, the appellant was not entitled to a peremptory instruction based upon his argument that the killing was justifiable homicide. The rule regarding peremptory instructions is that all the evidence for the state must be taken as true as well as all the reasonable inferences to be drawn therefrom. Then, if such evidence supports the conviction, the peremptory instruction must be denied. Cochran v. State, 278 So.2d 451 (Miss. 1973).
The state's evidence was that the officers shouted out their identity and their purpose, and warned the occupants to come out. FBI Agent Amann on direct examination for the state testified that appellant stated to him that he looked out in front of the residence and saw a police vehicle with a flashing blue light revolving. Other state's evidence was that Officer Sammon (using the megaphone) advised the occupants that if they came out peacefully the people "we had warrants for" would be arrested. Nevertheless, appellant from inside the house, while resisting a lawful attempt of officers to arrest other occupants, fired out at the law enforcement officials, indicating a deliberate design to kill the deceased. Therefore, the appellant upon the proof and posture of the record was not entitled to have the jury consider only the issue of manslaughter. Neither was he entitled to a directed verdict or peremptory instruction. As to whether or not appellant's use of the deadly weapon was justified, the jury accepted the state's evidence as it had a right to do.
The appellant failed to object to the state's instructions on murder under Mississippi Supreme Court Rule 42. His requested instruction number three was properly refused because it was confusing and so lacking in clarity that it could not have been an adequate guide or helpful to the jury. Numerous jury instructions were granted at appellant's request which submitted to the jury every defense theory asserted by him, including self-defense, justifiable homicide, and manslaughter.

V.
The next proposition urged by appellant is his contention that the trial judge erroneously permitted prejudicial cross-examination of certain defense witnesses. He argues that it was error for the trial court to allow the state to ask Tamu Sana (Ann Lockhart) if she and appellant were legally married. On direct examination she had stated that she and appellant "came together in a marital situation in October ... 1970." In response to defense counsel's questioning, she had also testified that they were sleeping together the night prior to the shoot-out. Therefore, the defense having raised the issue of appellant's marital relationship with Tamu Sana, it was not reversible error for the prosecution to cross-examine her as to *262 what she meant by "coming together." Lay v. State, 248 So.2d 794 (Miss. 1971). She stated, without any objection having been made by defense counsel, that she and appellant had never been married pursuant to a statute, but that their "marriage" was an informal agreement between them. Since defense counsel elicited the original testimony about the marital situation, it was not reversible error for the prosecuting attorney to cross-examine her about the marital status. Sumrall v. State, 272 So.2d 917 (Miss. 1973), relied upon by appellant, is factually distinguishable and not applicable.
Next, appellant states that error resulted from permitting the prosecution to cross-examine appellant's character witnesses concerning the circumstances of appellant's arrest and also his association with the RNA. There is no merit in this contention because the reputation of appellant had already been injected as an issue by his character witnesses and, therefore, evidence of appellant's bad character was admissible. Hamilton v. State, 197 So.2d 469 (Miss. 1967). Here, the questions directed at the bad character of the appellant were limited to activities which occurred before the alleged crime and not after.
This Court has carefully examined the voluminous record of this case consisting of thirteen volumes, and discussed those assignments of error which warrant discussion. Complicated factual and legal questions are involved but nothing in the record indicates that the appellant did not receive a fair and impartial trial. The trial court within its sound discretion properly overruled appellant's motions for change of venue, and to quash the indictment or order a mistrial because of alleged exclusion of members of the black race from the grand jury and special venire. No substantial proof was offered in support of either of these motions. The issue of appellant's guilt or innocence was appropriately submitted to the jury upon conflicting evidence, and adequate instructions. Since no reversible error appears in the record, we are required to let the conviction stand.
Affirmed.
GILLESPIE, C.J., and INZER, ROBERTSON and WALKER, JJ., concur.