419 So.2d 563 (1982)
Willie Albert SMITH
v.
STATE of Mississippi.
No. 53564.
Supreme Court of Mississippi.
August 11, 1982.
As Modified on Denial of Rehearing September 22, 1982.
*564 Minor F. Buchanan, Jackson, John E. Gregg, Raymond, for appellant.
Bill Allain, Atty. Gen. by Robert D. Findley, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before the Court En Banc.
BROOM, Justice, for the Court:
Death penalty sentence resulted from the capital murder trial of Willie Albert Smith (defendant) in the Circuit Court of the First Judicial District of Hinds County, the Honorable William F. Coleman, Circuit Judge, presiding. The indictment charged that the defendant murdered Shirley Roberts while "engaged in the commission of the crime of robbery of said Shirley Roberts ..." On his appeal, the defendant (1) challenges several evidentiary rulings made by the trial court, (2) contends that the verdict and sentence were unsupported by the "weight of the evidence", and (3) asserts that Mississippi Code Annotated §§ 97-3-21 and XX-XX-XXX (Supp. 1981), are unconstitutional as violative of the Eighth and Fourteenth Amendments to the United States Constitution. We affirm.
Shirley Roberts, the murder victim, was the manager of Tote-Sum Store No. 6, situated on Robinson Street in the City of Jackson. She normally arrived to open the store about 5:15 A.M., but unfortunately on the morning of March 15, 1981, upon her arrival she was assaulted and abducted and subsequently murdered. Kenneth Thomas testified that, shortly after 5:00 on that morning, he was driving by the Tote-Sum in a car with James Wells. As they passed the Tote-Sum store, they saw a black man in the parking lot (later identified as the defendant) grab a white woman who struggled with him. Thomas's driving companion, James Wells, stated that he saw the defendant grab the woman and choke her, but, not wanting to become "involved", they drove on. A few minutes later they returned, at which time Jackson Police Department officer G.E. Otis was present. They related to Otis what they had seen a *565 few minutes earlier. Officer Otis conducted a preliminary search and discovered in the parking area by the Tote-Sum store the following items: car keys, brass knucks, a twenty-dollar bill, a woman's (right) tennis shoe, and a pair of eyeglasses. Witness Thomas indicated in his testimony that Mrs. Roberts was about to unlock the store when the defendant grabbed her. Thomas last saw the woman at approximately the spot where the glasses, brass knucks and tennis shoe were found. At trial, Thomas testified that the next day he identified the defendant in a lineup as the person with whom the woman struggled outside the store.[1] Thomas's testimony was substantially corroborated by that of his friend, James Wells.
Officer Otis testified that he was present at the store when Thomas and Wells arrived and related to him the incident they had seen transpire between the defendant and the woman (Mrs. Roberts) in the parking lot. He conducted a preliminary search at the exterior of the store and discovered the twenty-dollar bill, car keys, brass knucks, a woman's-type tennis shoe and eyeglasses. The officer determined that a car in the parking lot was that of Mrs. Shirley Roberts, but she was not on the premises. Then Officer Otis noticed a red Pinto traveling on Robinson Road which fit the description of the suspect's car given him by Thomas and Wells. A few minutes later he stopped the vehicle which was being driven by defendant Willie Albert Smith. During the process of stopping the defendant, Officer Otis saw the defendant put something under the right side of the front seat, which, upon investigation, was discovered to be a shoe: the mate to the one found at the parking lot. Otis observed mud and blood on the defendant's hands and arrested the defendant. The defendant told Otis that he had borrowed the red Pinto from one Edward Charles McDonald and directed the officer to McDonald's address. McDonald, in turn, directed them to an apartment off Henley Street where the defendant lived. During their investigation, the officers followed a "drag trail" from the house to a wooded area where they came to a ditch of water covered with leaves, from which a human foot protruded. The body in the water was later identified as that of the victim, Mrs. Shirley Roberts.
Cause of death, according to the testimony of Dr. Rodrigo Galvez, was manual strangulation or choking. He found scratches and abrasions about her knees, ankles, and on her right hip. There was a marking around her neck. Testifying in his own defense, the defendant denied that he had ever seen Mrs. Roberts or that he had anything to do with her death or any robbery. Additional facts will be stated as needed in this opinion.
The first argument made by the defendant is that the trial court "committed reversible error by admitting (sic) the prosecution to introduce the criminal record of another as being that of the defendant's... ." On direct examination, the defendant gave testimony pertaining to his prior criminal record, and during his cross-examination he was queried about prior convictions of disorderly conduct and resisting arrest, which he denied. In rebuttal, the state called the keeper of the Jackson Municipal Court records, Mr. Gladney, who testified that a Willie Albert Smith had been convicted for disorderly conduct and resisting arrest. On cross-examination, Gladney stated that according to his records Willie Albert Smith would be twenty years old at the time of trial of this cause, and had lived at 118 Bonair in Jackson, and had a social security number of XXX-XX-XXXX. The defendant testified that he was twenty-three years old at the trial date, had never lived at the mentioned address, and had a different social security number from the one produced by Gladney. He contends that *566 the conviction record of disorderly conduct and resisting arrest was in fact the record of another person and that its use constituted reversible error.
We note that first to bring up the subject of the defendant's past criminal record was his own counsel, who asked the defendant about two prior convictions which he acknowledged. Then counsel made no objection to Officer Gladney's testimony, and at no time during the trial was there any attempt on the part of the defense to have the testimony excluded. Our general rule is that reversible error cannot be predicated upon the trial court's failure to exclude evidence as to which there has been no timely objection or motion to exclude. Black v. State, 308 So.2d 79 (Miss. 1975). Nevertheless, we have here considered the argument. We point out that when one gives data to arresting officers or to a court clerk, the content may be true and accurate, or may be false and misleading. Of course, the jurors were allowed to hear all of the evidence concerning the names and identification and other data in question which raised a question of credibility for them to consider. In the jury's evaluation of the defendant's credibility, the decision as to the weight to be accorded this evidence was within the sole province of the jury's role as fact trier. Defense counsel's election to bring up the subject of the past criminal record cannot be charged to the prosecution or the trial court. Defense counsel's further election not to object to the portion of the arrest record brought out by Officer Gladney may have been a trial strategy decision to gain the jury's sympathy by attempting to put the prosecution in the unfavorable light of unfairly using the criminal record of another defendant. Reversible error cannot be predicated upon this aspect of the case.
The next argument advanced by the defendant is his contention that Mississippi Code Annotated §§ 97-3-21 and XX-XX-XXX (Supp. 1981) "are unconstitutional and violative of the Eighth and Fourteenth Amendments to the United States Constitution." He says that § 97-3-21 "is unconstitutional in that it does not allow the jury to sentence a defendant to life imprisonment without parole." The following is asserted in his brief:
[T]he only instances in which one may be sentenced to life without parole are: (1) § 99-19-107, Mississippi Code of 1972, which states that in the event the death penalty is held unconstitutional, the person shall be sentenced to life without parole; (2) § 99-19-81 and 83 of said Code which are commonly called the habitual offender act, and (3) if one is convicted of armed robbery and given life, then § 47-7-3(d) of said Code would prevent his release or make his sentence life without parole.
He contends that because of the different sentencing options available under our present statutory scheme "and the absence of life without parole the imposition of the death penalty denies equal protection of the law and amounts to cruel and unusual punishment in view of the available options." He says that under the present law execution is the only means by which a jury can be sure that the defendant will not be released and again return to society. He takes the position that regardless of how a jury might view an individual case, death is the only means to prevent the defendant from ever being released again. Further, he asserts "that the death penalty is per se cruel and unusual punishment" ... and "that the absence of the alternative form of sentencing ... denies equal protection of the law ..."
According to our prior decisions, the legislature's prerogative is to define crimes and set the punishment for offenders. Peterson v. State, 268 So.2d 335 (Miss. 1972). Also, we have held in a number of instances that the death penalty is not per se unconstitutional. Bullock v. State, 391 So.2d 601 (Miss. 1980); Washington v. State, 361 So.2d 61 (Miss. 1978). Similar issues were before the Court in Capler v. State, 237 So.2d 445 (Miss. 1970), wherein we stated:

Viewing the statute as here construed, the fact that a jury could impose life imprisonment in one case and death in *567 another, or different punishments in the same case, does not result in the possibility of unequal punishment to that class of persons convicted of murder in the first degree. The legislature has a very great latitude in prescribing and fixing punishment for crime. Id. at 451. (Emphasis added). (Quoting from State v. Latham, 190 Kan. 411, 375 P.2d 788 (1962), cert. denied 373 U.S. 919 [83 S.Ct. 1310] 10 L.Ed.2d 418 (1963)).
The defendant is basically contending that the fact that the legislature declined to allow a jury to choose among conceivable gradations of punishment between the two statutorily specified alternatives, renders those statutory alternatives cruel and unusual. To follow his reasoning to its logical conclusion, any statute imposing such alternative penalties must allow for the jury to determine at exactly what point in his sentence the defendant should become eligible for parole. Such determinations are clearly within the legislative and executive province. The legislature's decision to provide two alternative penalties, with clear guidelines for the application of each, is unquestionably within their proper discretion. Accordingly, this argument lacks persuasion.
The next issue raised by the defendant is whether the trial court erred in "allowing photographic slides previously admitted in evidence to be projected upon a screen during the state's closing argument in the sentencing phase." Our rule has long been that competency, relevancy, and materiality of photographs are matters resting within the sound discretion of the trial judge. Reddix v. State, 381 So.2d 999 (Miss. 1980). In the instant case, there is no indication that the photographs were inordinately gruesome or that they would have inflamed a juror. The photographs have probative value going to the nature of the wounds inflicted upon the victim. On the issue of whether the offense was especially heinous, atrocious or cruel, it is likely that the photographs likewise had some probative value, and accordingly their being allowed into evidence does not constitute reversible error. Coleman v. State, 378 So.2d 640 (Miss. 1979).
Next the defendant contends that the jury's verdict at both the guilt and sentencing phases of the trial is "contrary to the great weight of the evidence." This portion of his argument, constituting only one page of his brief, sets forth neither logic nor authority in support of his bare contention that the verdict of guilty and the sentence of death were unsupported by the weight of the evidence.
Strong and convincing evidence links the defendant with the killing of Mrs. Roberts and establishes beyond a reasonable doubt that he was the guilty person. He was seen struggling with a woman at the Tote-Sum Store. In the car he was driving when stopped was a woman's tennis shoe identified as that of Mrs. Roberts, matching another shoe taken from the parking lot just outside the store where she was seen struggling with the defendant. In that same location were found her eyeglasses, and a pair of brass knucks which, according to his friend Charles McDonald, appeared to be the same knucks shown McDonald during the preceding night at the wedding party.
Edwina Ard, a criminalist with F.B.I. training, testified that blood taken from the defendant's khaki pants was identical to Shirley Roberts' blood in all aspects tested, and that only .29%, considerably less than 1%, of the population had that particular combination of blood characteristics. Joe E. Andrews, also an F.B.I.-trained forensic scientist, specializing in hair and fiber identification, testified that he compared samples of pubic hairs taken from the defendant with combings obtained from the pubic area of Shirley Roberts, and found the same microscopic characteristics.
The defendant's version was that he had never seen Mrs. Roberts and had nothing to do with her death. On the witness stand he testified that at about 4:30 or 4:35 A.M. he borrowed Charles McDonald's car, a red Pinto, with instructions to return it by 7:00 A.M. He stated that he was using the car to deliver a package to the University Medical Center area but had car trouble and *568 returned to his apartment to make repairs. There, he was afraid to enter because the lights were on in his apartment and the radio playing. Instead of going inside, he changed into some clothes and shoes that were outside. He further testified that he "turned to leave the front porch and fell backwards and passed out and did not awaken until morning." After he awakened, he drove down Robinson Road and he observed a police car, which reminded him that his driver's license had expired. According to the defendant, he threw out a package of marijuana after which he was stopped while reaching for a cigarette he had dropped. He denied ever having the woman's shoe that was found in his car, but asserts that he saw the policeman put the shoe in his car. After hearing Charles McDonald testify that he (defendant) had a pair of brass knucks at the party, the defendant denied having the knucks.
On the witness stand during the sentencing phase, the defendant admitted that on two prior occasions he had been in an altercation and had shot a weapon in an argument about a van and on another occasion had shot up in the air during an argument with his brother-in-law. Testifying for him at the sentencing phase were his mother and several relatives who had a rather high opinion of him but who knew about his prior difficulties. We cannot say that the jury's verdict, returned at either the guilt phase or the sentencing phase, was unsupported by the evidence beyond a reasonable doubt.
The next argument asserted by the defendant is that the trial court erred during the sentencing phase in allowing the jury to find that the murder was committed for pecuniary gain. Precisely, the defendant contends "that this aggravating circumstance is meant to cover capital offenses committed for compensation from another source, i.e., a hired assassin, or one who murders to collect other benefits, as distinguished from robbery. There was no evidence of a pecuniary gain in this meaning throughout the entire trial."
Instruction number S-4 allowed the jury to find from the evidence the following aggravating circumstances if any:
1. The capital murder was committed while the defendant was engaged in the commission of robbery;
2. The capital murder was committed for pecuniary gain;
3. The capital murder was especially heinous, atrocious or cruel.
The defendant's position is that the inclusion of the second enumerated aggravating circumstance, i.e., that the capital murder was committed for pecuniary gain, renders the allowance of this instruction reversible error for reason that the same burdened him with "the necessity of overcoming two aggravating circumstances" when he had been "charged with a murder during the course of a single felony." When the Court along with counsel was considering state's instruction number S-4, the following is excerpted from the record:
BY MR. GREGG:
If the Court please, for purposes of the record, I would object to it because I don't think that has been proven beyond a reasonable doubt. I just make that for record purposes.
Obviously the defense objection made at the trial level was not on the same ground here argued, and ordinarily cannot on appeal be ground for reversal upon a different ground from that asserted below. Daumer v. State, 381 So.2d 1014 (Miss. 1980). Nevertheless, we have specifically upheld the instruction now attacked, and we can find no merit to the present argument. Voyles v. State, 362 So.2d 1236 (Miss. 1978); Bell v. State, 360 So.2d 1206 (Miss. 1978).
As his final argument, defendant asserts that the trial court "erred in overruling defendant's motion to suppress evidence taken from the defendant's apartment and further erred by admitting the evidence in the trial ..." The defendant points out that the law officers "made a cursory search of the apartment and failed to discover" Shirley Roberts. Raising no challenge to the officers looking inside the apartment for Mrs. Roberts, the defendant *569 states that they failed to seize any evidence during this first search of the apartment which they exited and went outside and then discovered her body 40 to 50 yards away. The officers informed the mobile crime lab personnel about the objects they had seen in the house. He notes that the crime lab technicians came and removed the victim, and it was their "re-entry" and warrantless search of the apartment (made without the defendant's consent) to which he now, as he did at the trial level, objects. During re-entry of the apartment, an evidence technician (officer) seized a padlock, two pair of pants, a pair of shoes, a wallet, a purse, a sweater, a blanket, and the sheets from the appellant's bed, and took photographs. Also "re-entering" the apartment were police officers Adams, Patton and Foundren of the Mobile Crime Lab, who pointed out the observed objects.
The defense argues that this evidence, taken during re-entry of the apartment and used at trial, was extremely prejudicial and should have been excluded. He concedes that the rule against warrantless searches is subject to a few "specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). He theorizes that this "second" search was not incident to any established exception to the warrant requirement, and that the state failed to meet its burden to show any exception to that requirement. In reply, the state correctly notes that no full-fledged extensive investigatory search was conducted, and that the items which were seized had been observed to be "in plain view" during the initial search of the premises. Both the original entry and subsequent re-entry were closely related in time, and the re-entry was confined to the area of the initial intrusion. Under such factual circumstances the seizure of those items was not violative of Fourteenth Amendment proscriptions.
The record is somewhat ambiguous regarding the sequence of events surrounding the search. For the purposes of clarity, the following chronology of events is set forth:

4:30 A.M. Smith borrows McDonald's car.
5:00-5:10 A.M. Smith seen leaving Tote-Sum with Mrs. Roberts, by
 two witnesses.
5:30 A.M. Sgt. Otis arrives at Tote-Sum to make phone call.
 The two witnesses approach him and relate the
 incident they observed, describing with
 particularity the vehicle involved. Sgt. Otis
 radios this information to headquarters and
 locates one of the victim's shoes (and other
 items) in the parking lot. Sgt. Otis remains at
 the Tote-Sum for approximately 45 minutes.
5:40 A.M. Officer Terry Grice arrives at the Tote-Sum in
 response to Otis's radio call. He leaves shortly
 thereafter.
6:15-6:20 A.M. Sgt. Otis, still at the Tote-Sum Store, sees a red
 Pinto fitting the witnesses' description
 approach the store, do a "U-turn" and leave. He
 pursues and stops the vehicle. He asks the
 driver, Willie Albert Smith, to get out of the
 car. Smith has no driver's license on his
 person.
 Upon exiting the vehicle, Smith gets
 belligerent. Sgt. Otis observes the other shoe
 in the car and places Smith under arrest. Sgt.
 Otis observes mud and blood on Smith's hands.
6:20-6:25 A.M. Officer Grice arrives at the scene of the stopped
 vehicle.
6:30 A.M. Sgt. Otis, Officer Grice and others go to
 McDonald's house (the owner of the car). They
 stay approximately 10 minutes, during which time
 McDonald agrees to show them to Smith's house.
 Smith is still in Sgt. Otis's car.
6:45 A.M. Officers meet at Smith's apartment. Sgt. Otis
 remains at the car with Smith. Officers Grice
 and Roebuck make the first search of the house,
 looking for Mrs. Roberts. During the course of
 this search, they observe several articles,
 including some articles of women's clothing, but
 do not stop to collect any of these articles.
 They search the house for approximately 4
 minutes and determine that Mrs. Roberts is not
 in the house. They exit.
6:50 A.M. Search begins outside the house.
7:12 A.M. Mrs. Roberts' body is discovered.
7:20 A.M. The mobile crime lab arrives on the scene with
 Officer Walter Welch and three others,
 approximately

*570
 50 minutes from the first officers' arrival and
 search.
 Upon being informed of the existence of certain
 articles in the house, they enter the house and
 enter Smith's bedroom.
 They stayed in the room approximately 30 to 35
 minutes, photographing the room and removing the
 articles on Smith's bed and on the floor.
8:00 A.M. The police leave the scene.

For clarity, we summarize the status of the situation at approximately 6:30 A.M. when the officers, with Smith in custody, arrived at his house (apartment). Two eye-witnesses had reported an assault and abduction. One of the victim's shoes had been found at the store and the other in the defendant's car. The defendant (with bloody hands) had been taken into custody within approximately one hour from the time of abduction, and the officers were in front of his house, a relatively short distance from the scene of the abduction.
In the context of these circumstances, the record shows that Officer Grice, a Jackson Police Department official, accompanied by several other officers, first entered the apartment trying to locate Mrs. Roberts, "because we were worried about her well being. We didn't know whether she could possibly have been injured or something like that and we were concerned about her well being."
Given the above situation, were officers Grice and Roebuck within their legal authority in making a warrantless search of Smith's apartment without his consent? Courts in all jurisdictions have long recognized the existence of an "exigent circumstance" or "emergency doctrine" exception to the requirement for a warrant for search and seizure. The "emergency doctrine" has its roots in the common law, U.S. v. Barone, 330 F.2d 543 (2d Cir.1964). Many recent decisions, both state and federal, have recognized that "important legitimate governmental interests may override the Fourth Amendment warrant requirement when official conduct is prompted by the motive of preserving life and reasonably appear[s] to be necessary for that purpose." United States v. Perez, 440 F. Supp. 272, 288 (N.D. Ohio 1977), at n. 45, (see also cases cited therein).
Conduct prompted by the motive of preserving life has been upheld by the courts in a wide variety of circumstances. People v. Mitchell, 39 N.Y.2d 173, 383 N.E.2d 246, 347 N.E.2d 607 (N.Y. 1976); United States v. Perez, 440 F. Supp. 272 (N.D. Ohio 1977); Patrick v. State, 227 A.2d 486 (Del. 1967); Wayne v. United States, 318 F.2d 205 (D.C. Cir.1963), (Burger, Circuit Judge, concurring). See generally, LaFave, Search and Seizure, § 6.6 (1978). Obviously there is well-established judicial acceptance of the "emergency" or "exigency" doctrine as a narrowly defined exception to the general requirement of a warrant for all searches and seizures. What constitutes an emergency or an exigency that will allow such a warrantless search?
The basic elements of the exception may be summarized in the following manner: (1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property. (2) The search must not be primarily motivated by intent to arrest and seize the evidence. (3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.
When may an officer claim an emergency or exigent circumstances so as to justify his warrantless entry and search of premises for which there is a "reasonable expectation of privacy?" (See Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), (Harlan, J., concurring)). As then Circuit Judge Burger noted in Wayne v. United States, supra:
Neither the Constitution, statutes or judicial decisions have made the home inviolable in an absolute sense. Collectively they have surrounded the home with great protection but protection which is qualified by the needs of ordered liberty in a civilized society.

*571 Breaking into a home by force is not illegal if it is reasonable in the circumstances. 318 F.2d at 211-12.
The reasonableness of those circumstances must be evaluated on a case by case basis. In light of the sequence and the timing of the events which transpired on March 15, 1981, Officers Grice and Roebuck's belief that Mrs. Roberts was probably on the premises of defendant Smith's residence and either in extreme danger or in need of immediate assistance was sufficiently reasonable and well-founded to justify their original entry into defendant Smith's apartment. The legality of this entry is conceded by defense counsel.
Once lawfully within Smith's apartment, the question arises as to the authority of the officers to effect seizures of certain objects within the dwelling. This question was asked somewhat rhetorically by then Circuit Judge Burger in Wayne, supra:
Are we to say that police or firemen may enter to apply a tourniquet or resuscitator, for example, but may not act on evidence of a crime which they then observe incidentally without any search? 319 F.2d at 212.
Certainly it cannot be said that the mere existence of either exigent circumstances or an emergency justifies a warrantless search unlimited in scope. The limits in the scope of a warrantless search undertaken pursuant to the emergency doctrine are embodied in the plain-view rule as set forth by the United States Supreme Court in Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).[2]
In Coolidge, the United States Supreme Court points out that anytime any evidence or contraband is seized, such evidence or contraband is almost always in "plain view". Therefore, the question is to determine both the legality and the legal significance of the circumstances bringing the officer into view of the evidence in question. "Plain view" in and of itself is never enough to justify the warrantless seizure of objects. No amount of probable cause alone will suffice to justify such a "plain view" seizure. 403 U.S. at 468, 91 S.Ct. at 2039, 29 L.Ed.2d at 586. However, when the "plain view" of an object is coupled with sufficiently "exigent circumstances", the warrantless seizure of such an object is permitted. Coolidge gives several examples of these types of exigent circumstances: (1) when an incriminating object is discovered pursuant to a lawful search (via search warrant) for other specified objects; (2) when the incriminating object comes into plain view during the hot pursuit of a fleeing criminal; (3) when the incriminating object comes into plain view during the limited search of a suspect incident to an arrest; (4) when an officer is not searching for evidence, but inadvertently discovers the incriminating object.[3] In the instant case, the officers' original justification for entry into Smith's apartment clearly falls within the "exigent circumstances" as set forth in Coolidge.
Consideration of the search of the defendant's apartment and the subsequent seizure of the articles in question does not *572 stop with the justification for the initial entry and a discussion of whether a seizure of the incriminating objects at that time would have been lawful. Officers Grice and Roebuck left the house after satisfying themselves that Mrs. Roberts was not in the house. They then proceeded to search the area immediately surrounding the house where they discovered Mrs. Roberts' body. Defense counsel contends that at this point the exigent circumstance lapsed and any subsequent re-entry into the house required a warrant. A proper analysis of Coolidge and the underlying basis for the justification of "plain view" seizures reveals the fallacy in this contention. What if the police, upon their lawful entry into the defendant's apartment, and after seeing the various articles of clothing, etc. lying in plain view upon the bed and the floor, and recognizing them for their evidentiary value, had stopped to gather them up, log their positions in the room, and otherwise insure that their evidentiary value was preserved? Such actions on the part of the police officers might have cast grave and possibly fatal doubts upon the validity of the exigent circumstances justifying their initial entry. See Root v. Gauper, 438 F.2d 361 (8th Cir.1971). A careful analysis of the actions of the officers upon reaching the scene of the "emergency" is vital to insure that the emergency doctrine exception to the requirement of a warrant does not escape its bounds and engulf the general rule. In the instant case, any actions on the part of the police officers other than those which clearly reflected their belief that Mrs. Roberts was in the vicinity, either in the house or immediately outside it, would have tended to cast doubts upon the validity of their search.[4]
Viewed from this perspective, the conundrum of the emergency doctrine exception becomes apparent. If the officers stopped to seize the evidence in plain view, their initial search is invalidated since their actions would not have been consistent with the existence of an emergency. If they continue to search for the victim, so that the object is no longer in plain view, they may not return and seize the incriminating objects without first obtaining a search warrant. The solution to this dilemma must follow one's viewing the totality of the circumstances surrounding the initial entry and search. From the time of their initial entry, the officers of the Jackson Police Department were engaged in only one search. That search had only one goal: locating Mrs. Roberts (and assisting her, if not too late). The actions of Officer Welch and the other members of the mobile crime lab (after the re-entry of the apartment) were merely to effectuate the physical seizure of articles in plain view which Officers Grice and Roebuck would have been able to seize had not the circumstances been so "exigent". There was no unwarranted delay in time, nor was there any expansion of the scope of the search. The fact that the actual physical taking of the items into the custody of the police was effectuated by an evidence technician who was trained to preserve the evidentiary value of the objects, rather than by the first officers to view the objects, is not significant.
The state cites the case of La Fournier v. State, 91 Wis.2d 61, 280 N.W.2d 746 (1979), which dealt with the validity of a warrantless search and seizure of evidence following an initial entry into the defendant's place of residence. In that case, the first officer who entered the residence did so without a warrant under the "emergency rule". He observed "plain view" incriminating evidence and called for assistance much as happened in the instant case. He called for other officers to "secure the scene" and left. Three other officers came within about fifteen minutes and entered the defendant's premises. Evidence seized during this alleged "second entry" was sought to be suppressed. The Wisconsin Supreme Court upheld the last entry and seizure of evidence, and stated:
The three officers did no more than Weiland would have been justified in doing *573 had he remained on the premises. They entered the same area of the house in which Weiland had found the drug victim and in which the contraband was discovered in plain view. These officers were called as backup; they were completing that which was lawful under the first entry, securing evidence in plain view. They did not expand the scope or nature of the original entry. Their purpose was limited to the evidence Weiland had found in plain view. That evidence and La Fournier's statement that he had just shot up provided the officers with probable cause for La Fournier's arrest and the custodial search which brought to light the heroin.
Whether a subsequent entry is detached from an initial exigency and warrantless entry or is a continuation of the lawful initial entry can be determined only in light of the facts and circumstances of each case. We conclude that in the instant case the successive intrusions of Weiland and the three officers were close in time and practically identical in nature so as to be analytically and factually inseparable. The entry of the three officers must be regarded as a continuation of Weiland's initial legal entry. No warrant was needed.
Id. at 69-70, 280 N.W.2d at 750-51.
This Court has been confronted with a somewhat similar situation. In Norman v. State, 302 So.2d 254 (Miss. 1974), the Jackson police and the F.B.I. had arrest warrants for four people, and had received reliable information as to their location. Upon arrival at the house which informants had indicated as the suspects' dwelling, a shoot-out occurred, killing one officer. Tear gas was employed and the occupants of the house surrendered. The officers entered the house and began to search for weapons. In the process of this legal search, they discovered what appeared to be a bomb. They immediately, and quite reasonably, left the house until an army bomb squad was able to come and remove the bomb from the house. Then they resumed the search. At trial the defendant sought to suppress the objects recovered as the result of this second search, claiming that there had been an illegal re-entry. In upholding the validity of this "second search", we noted several factors which justified the officers' actions. The original search had not been completed due to the discovery of the bomb. During the hiatus of the search, the police officers maintained the status quo awaiting the bomb squad. There was no unreasonable lapse of time. Finally, when search was resumed it was merely a continuation of the original search and hence could not be held to be unreasonable. See Crum v. State, 349 So.2d 1059 (Miss. 1977). See also, Voss v. State, 198 Tenn. 135, 278 S.W.2d 667 (1955), cert. den. 348 U.S. 965, 75 S.Ct. 526, 99 L.Ed. 752 (1955); State v. Downey, 104 Ariz. 375, 453 P.2d 521 (1969).
In the instant case, the justification for the initial search differs from Norman, (emergency circumstances versus a search incident to an arrest), but in both situations the officers' presence within the dwelling had a prior legal justification. The original search in the present case was not completed due to the overriding importance of first locating Mrs. Roberts. After the officers first exited defendant Smith's apartment, Jackson police officers continually maintained the status quo around the residence. There was no unreasonable lapse of time between the initial viewing of the incriminating objects and the subsequent physical seizure. Finally, the entry of the house by the members of the mobile crime lab merely constituted a continuation of the original search. The only objects seized were those in plain view (or contained within them) and the only room searched was the one room in which they were seen.
Accordingly, we conclude that the original entry of Officers Grice and Roebuck appears justified under the emergency doctrine exception to the requirement of a warrant for the entry and search of a dwelling. Once in Smith's apartment, they were authorized to seize incriminating objects coming into plain view. The fact that they did not do so at the time is merely evidence of the exigency of the particular *574 circumstances. The second entry into Smith's apartment by members of the mobile crime lab constituted a continuation of the original search. Therefore, the decision of the trial court to overrule the appellant's motion to suppress those items of evidence recovered as a result of the search of Smith's apartment was not error.
In its (appellee's) brief filed in response to the defendant's (appellant's) brief, the state did not see fit to set forth a statement of facts. Whereupon, this Court in writing (dated July 6, 1982) asked the state to file a "statement of facts as to all pertinent circumstances related to search of the apartment and seizure of evidence." We also asked the state for additional "authorities or decisions" concerning "re-entry of the apartment and seizure of evidence ..." The state complied with the Court's request, and in response thereto defense counsel filed a pleading by which the appellant "prays that the appellee's brief and attempted supplement ... be stricken and this case remanded for new trial ..." Also, defense counsel discussed further the facts surrounding the search of defendant's premises and the seizure of evidence, and set forth his views on cases cited by the state in its response to this Court's request. Defense counsel also asserted additional argument concerning "in court identification" of the defendant by state's witnesses. Also discussed in the response of defense counsel is the issue of the "pretrial identification" of the defendant.
This Court has carefully considered all these matters discussed in the paragraph immediately above, and all propositions argued. Our review of the case has extended to every part of the record which includes motions for change of venue, motion to suppress evidence, discovery motions, jury instructions, and a meticulously detailed motion for new trial. Jury instructions given clearly and adequately advised the jurors in all material aspects of their function. At the sentencing phase, jurors were liberally and specifically instructed as to mitigating circumstances which they were allowed to consider, including the defendant's age, lack of significant criminal record, his employment record, plus "any and all other matters ..." which the jurors saw fit to "consider from the evidence as mitigating circumstances". Jurors were instructed that they could consider "any circumstance or combination of circumstances" surrounding the defendant's life and character, and surrounding the offense which "reasonably mitigates against imposition of the death penalty." No reversible error has been pointed out by counsel, and we have been unable to find such.
After carefully reviewing this record, we have compared it with all our decisions upholding death penalties subsequent to Jackson v. State, 337 So.2d 1242 (Miss. 1976). For other cases wherein we have affirmed the death penalty, see Bullock v. State, 391 So.2d 601 (Miss. 1980). See also Johnson v. State, 416 So.2d 383 (Miss. 1982). By his own testimony, the defendant admitted that he had a prior record of previous convictions for criminal offenses. He admitted that on two occasions he had fired a deadly weapon in separate altercations with other people. Comparison of this case with the other cases in which we have affirmed the death penalty causes us to conclude that such penalty here is not excessive in view of the aggravating and mitigating circumstances shown. No argument can be logically made that the execution of Smith upon this record would be wanton or freakish. We find that his execution would be consistent and even-handed with all the post-Jackson death penalty cases which we have previously affirmed.
At the trial the defendant was ably defended by astute counsel retained by his family. The trial accorded him was fair, and the verdict and sentence were based upon evidence which established his guilt and aggravating circumstances beyond a reasonable doubt.
Affirmance is, therefore, ordered, and Wednesday, the 29th day of September, 1982, is fixed as the date on which the death sentence shall be executed as provided by law.
AFFIRMED.
*575 PATTERSON, C.J., SUGG and WALKER, P. JJ., and ROY NOBLE LEE, BOWLING, HAWKINS, DAN M. LEE and PRATHER, JJ., concur.
NOTES
[1] On cross-examination, Thomas' version of the identification process became somewhat confused and contradictory. The appellant apparently contends that such impeachment on cross-examination renders the record devoid of any testimony which will support a finding that Thomas identified the defendant the next day in a lineup. Such contradictory statements go only to the weight and credibility of the witness's testimony, which is properly solely within the province of the jury.
[2] The defendant relies upon the Mississippi case of Isaacks v. State, 350 So.2d 1340 (Miss. 1977), claiming that the list of four circumstances in which the "plain-view" seizure of contraband is held to be authorized is exhaustive in nature. Such reliance is misplaced. The four circumstances enumerated in Isaacks come essentially from the Coolidge case, with the exception of the fourth requirement, "incident to a search of a stopped automobile on probable cause or because of the mobility of the vehicle." Isaacks at 1344. This listing of the four circumstances in Isaacks should not be read as constituting an exhaustive enumeration, but rather should be read under the doctrine of ejusdem generis as being examples of the types of circumstances which are discussed in the Coolidge case within the overall framework of a Fourth Amendment analysis.
[3] The Supreme Court cites Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067, as an example of this exigent circumstance. The Harris case, it should be noted, involved the discovery of a car registration card during the process of impounding an automobile. The court upheld the inadvertent discovery of the registration card since such discovery was the result of a "measure taken to protect the car." Surely measures taken to protect a life are infinitely more worthy of justification.
[4] Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), relied upon by the defendant, is factually quite different from the present case and not controlling.