# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 97-KA-00560-SCT

*CHARLES TAYLOR*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/25/97 |
| TRIAL JUDGE: | HON. R. I. PRICHARD, III |
| COURT FROM WHICH APPEALED: | PEARL RIVER COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JAMES L. DAVIS, III |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | RICHARD DOUGLASS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 2/4/99 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 4/12/99 |

**BEFORE PRATHER, C.J., BANKS AND McRAE, JJ.**

**BANKS, JUSTICE, FOR THE COURT:**

¶1. This case raises the issue of whether evidence should have been suppressed where the officer did not seize the evidence during the initial entry into the defendant's home at the time of arrest, but rather upon subsequent entries. The defendant also claims that the trial court erred in holding that he, on invoking ***Batson***, would be required to provide race-neutral reasons for striking white jurors without the State first raising objection and showing a *prima facie* case for discrimination. We find that the entry into the defendant's home was warranted under the exigent circumstances doctrine and that the seizure of the evidence was warranted by the plain view doctrine. We, therefore, affirm the trial court's ruling regarding the admissibility of the evidence seized from the defendant's home and regarding the sufficiency of the evidence. We conclude however, that the trial court committed reversible error in disallowing certain defense strikes of jurors. Therefore, we reverse and remand.

## I.

¶2. Edith Chaves died on June 1, 1994, from complications associated with burns she received on May 4, 1994. Taylor was charged with causing Edith's injuries. On May 4, 1994, Julius ("Julius") and Rosalyn ("Rosalyn") Jones accompanied Taylor ("Taylor") from Louisiana to Pearl River County, Mississippi. They

had agreed to assist him in getting himself and Edith Chaves ("Edith"), his girlfriend, to a detox center. Both Taylor and Edith had serious drinking problems and both were under the influence on May 4, 1994. In fact, Edith had recently been released from a detox facility. Taylor was also afraid that he may have hurt Edith by kicking her in the head earlier that day. Both Joneses testified that when they reached Edith's house she did not appear to be in good shape. Edith moved slowly and had a hard time moving on her own. Edith also complained of a headache.

¶3. Rosalyn assisted Edith in getting out of the tub and tried to help her dress, but stated that Edith was limp and would not cooperate. Rosalyn testified that she gave up trying to dress Edith and sent Taylor into the bathroom to try and dress her. Rosalyn stated that while she and Julius waited in the living room she heard Taylor raise his voice at Edith, cussing her. After Julius got Taylor calmed down, Taylor asked the Joneses to leave for a while and give him and Edith time to get ready. Refusing to drive back to Louisiana, the Joneses went outside and sat on the front porch, while Taylor, closing the front door, went back into the house. Rosalyn testified that she heard Edith say "no" several times and shortly thereafter Taylor called for Julius to come and help him.

¶4. Julius testified that when he got to the bathroom Edith was lying on the bathroom floor burning. Julius further testified that after he and Taylor had poured water on Edith to put out the fire, Taylor ran into the woods and did not come back. When Julius came out of the bathroom and told Rosalyn that Edith had burned she ran outside and waved down Ms. Mattie Delancey, Edith's neighbor, to call for help.

¶5. Upon receiving the call, Sheriff's Deputies Wesley Lossett and Len Landrum were dispatched to Edith's residence. They were told that there was a domestic dispute. When they arrived they found Julius and Rosalyn standing outside. The Joneses directed them through the house and into the bathroom. Upon entering the bathroom of the house the deputies found Edith lying nude on the bathroom floor with severe burns to her face, back, abdomen and legs. While in the house the deputies saw smoke and noticed an odor, which smelled like kerosene. Edith was airlifted to Forrest General Hospital. Later that night she was transferred to the Greenville Burn Center, where she remained until she died on June 1, 1994.

¶6. Various witnesses testified that Edith indicated that Taylor had set her on fire. Deputy Lossett testified when he asked Edith who caused her injuries she stated that Taylor had burned her. Ms. Delancey testified that when Emergency Medical Technicians placed a sterile sheet over Edith's legs and began pouring water on the sheet, Edith said, "Don't let him hurt me." Ms. Delancey also testified that she thought Edith told Julius that she did not know what it was that "he" had poured on her. However, there is some discrepancy as to whether this statement was made before or after the Emergency Medical Technicians poured water on Edith.

¶7. During the trial, Dr. Emily Ward was called by the State to testify as an expert in forensic pathology. Dr. Ward testified that she had performed an autopsy on Edith on June 2, 1994, and that the cause of death was extensive burns. Dr. Ward also testified that it was her professional opinion that Edith's burns were neither self-inflicted nor accidental.

¶8. On behalf of the defense forensic pathologist, Dr. Kris Sperry, testified that Edith's blood alcohol level at the time she was burned would have been approximately .41. He stated that even an experienced drinker would appear intoxicated at that level and that the things she said may not have been reflective of reality. Dr. Sperry also testified that he had reviewed pictures of Edith's injuries and that it was his opinion that the burns were consistent with self-inflicted burns.

¶9. The defense also called various witnesses to testify that Edith had on several prior occasions threatened to commit suicide if Taylor went back into detox and had threatened to burn down her house for the insurance proceeds. The testimony of Ms. Stacy Joyner was offered to impeach the testimony of Ms. Delancey. Ms. Joyner testified that in prior interviews Ms. Delancey had not stated that Edith said Taylor had poured any thing on her.

¶10. Prior to trial Taylor filed a Motion to Suppress, seeking to suppress all evidence deputies obtained from Edith's house. Stipulating that Taylor had standing to challenge the search and seizure, the circuit court held an evidentiary hearing to determine the admissibility of the evidence. The testimony introduced at the hearing revealed that after the officers arrived on the scene on May 4, 1994, Officer Lossett stayed with Edith, while Officer Landrum walked through the house. Officer Landrum testified that his purpose in walking through the house was to secure the house and determine if there were other fires. He stated that when he entered the bedroom, which was connected to the bathroom, he noticed a hurricane lamp with the globe off. After Officer Landrum walked through the house he left to see if he could find Taylor. When he returned to the house he brought his camera with him and took pictures of Edith's injuries, the bathroom and the lamps. He testified that they were not told that Taylor lived in the house.

¶11. When Captain Rodney Spears arrived on the scene forty-five minutes later, Officers Lossett and Landrum went through the house a third time, pointing out various items. Captain Spears collected various items of evidence. Among the items collected were burned clothing, sweepings from the bathroom floor, a box of matches from the bathroom floor and the hurricane lamps on the bedroom dresser. Captain Spears also directed the arson investigator to take wood shavings from the bathroom floor to be analyzed for possible accelerants.

¶12. At the end of the hearing the circuit court found that the evidence was legally obtained and denied the defendant's Motion to Suppress. In so holding the court found that the officers were in an emergency situation, and that the objects seized were in plain view.

¶13. During jury selection, the defense requested that the State provide a race-neutral reason for its peremptory strikes, after the State peremptorily struck two black jurors. The defendant was a white male. The circuit court stated that if the defense invoked *Batson*, the Mississippi Supreme Court required that the defense give a race-neutral reason for every white juror it peremptorily struck. The defense readily agreed.

¶14. The defense attempted to strike a juror stating that she was a school teacher and since school was in she would be needed in the classroom. The defense further stated that the juror was involved in a divorce and had not completed her questionnaire. In response the State pointed out that another juror, whom the defense had previously accepted, was also a teacher and was also divorced. The court refused to accept as race-neutral and gender-neutral the defense's reasons for wanting to strike the juror. Prior to this attempted strike the defense had struck one (1) white male and two (2) white females, with the court accepting the race-neutral reasons offered. The defense had also accepted seven (7) white males and one (1) white female juror.

¶15. Next the defense sought to peremptorily strike a juror on the grounds that as a pension specialist he may be needed at work and that it was possible the juror was related to an attorney in the area with the same last name. The court declined to accept this explanation as race-neutral. The court stated that if the juror needed to be at work he could have submitted an affidavit to that effect. The court further pointed out

there were a lot of people in the area with the same last name as the juror who were not related, so kinship was unlikely.

¶16. Next defense sought to strike a juror because he was self employed. The court once again rejected the defense's explanation, stating that the juror had an opportunity to submit an affidavit that leaving his job would cause undue hardship.

¶17. Taylor was found guilty of manslaughter and was sentenced to 20 years in the custody of the Mississippi Department of Corrections. Aggrieved, Taylor perfected this appeal.

## II.

### A.

¶18. Taylor asserts that the trial court erred in not suppressing the evidence obtained from Edith's residence. In determining whether evidence should be suppressed a trial court's findings of fact are not disturbed on appeal absent a finding that the "trial judge applied an incorrect legal standard, committed manifest error, or made a decision contrary to the overwhelming weight of the evidence." *Crawford v. State*, 716 So. 2d 1028 (Miss. 1998) (citing *Balfour v. State*, 598 So. 2d 731, 742 (Miss.1992)).

¶19. The circuit court found that the officers initial entry into the house was justified under the emergency circumstances exception to the warrant requirement. This Court has recognized that an emergency situation is a valid exception to the warrant requirement. *Graves v. State*, 708 So. 2d 858, 862-63 (Miss. 1997). The circuit court, citing *Smith v. State*, 419 So. 2d 563, 570 (Miss. 1982), recognized that the elements for the exigent circumstances exception are: (1) reasonable grounds to believe there is an emergency situation and there is an immediate need for their assistance in order to protect life and property; (2) the primary motivation for the search must not be an intent to arrest and seize the evidence; and (3) some reasonable basis, approximating probable cause, must associate the emergency with the area or place searched. Consistent with these basic elements the circuit court found the fact that the officers had been informed that Edith was burned and lying on the bathroom floor created an emergency situation. The officers entered the house and rendered necessary assistance to Edith in response to the emergency situation. Additionally, when Officer Landrum first walked through the premises he was still operating under the emergency situation. *Mincey v. Arizona*, 437 U.S. 385, 392 (1972). He was walking through the house to determine whether the house was still on fire and if anyone else needed assistance.

¶20. It must be determined whether the second and the third walk through the house and the seizure of the evidence were legally justified. Where an officer enters a residence under an emergency situation he may seize any evidence in plain view during the course of emergency activities. *Mincey v. Arizona*, 437 U.S. 385, 393 (1978). The circuit court found that all evidence seized was in plain view when Officer Landrum initially walked through the house. However, "[w]hether a subsequent entry is detached from an initial exigency and warrantless entry or is a continuation of the lawful initial entry can be determined only in light of the facts and circumstances of each case." *Smith*, 419 So. 2d at 573 (quoting *La Fournier v. State,* 280 N.W.2d 746, 750 (Wis. 1979)).

¶21. Once again citing *Smith*, the circuit court found that Officer Landrum was justified in returning to the house and taking pictures of those items which he had noticed in 'plain view' on his first trip through the house. After Officer Landrum's initial walk through the house he left the house to go search for Taylor. He

was only gone for a short time. He returned after failing to locate Taylor and went through the house a second time, this time taking pictures as he went. The circuit court's findings in regards to the second walk through were legally and factually sound.

¶22. The circuit court found that the third walk through the house and the seizure of the items were "continuations of the original plain view scene of these evidentiary items." "[A] warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation.'" *Mincey*, 437 U.S. at 393 (quoting *Terry v. Ohio*, 392 U.S. 1, 25-26 (1968)). *Smith* in upholding additional officers coming into the defendant's home and seizing items the original officers had observed in 'plain view', stated:

> From the time of their initial entry, the officers of the Jackson Police Department were engaged in only one search. That search had only one goal: locating [the victim] (and assisting her, if not too late). The actions of [the officer] and other members of the mobile crime lab (after the re-entry of the apartment) were merely to effectuate the physical seizure of articles in plain view which [the officers] would have been able to seize had not the circumstances been so "exigent". There was no unwarranted delay in time, nor was there any expansion of the scope of the search. The fact that the actual physical taking of the items into the custody of the police was effectuated by an evidence technician who was trained to preserve the evidentiary value of the objects, rather than by the first officers to view the objects, is not significant.

*Smith*, 419 So. 2d at 572.

¶23. Captain Spears testified that he arrived on the scene approximately forty-five minutes after Officers Lossett and Landrum. Similarly, in *Smith* those who seized the evidence arrived fifty minutes after the initial entry. *Smith*, 419 So. 2d at 569. Captain Spears did not expand the search and he only seized those items which were pointed out as having been in plain view. *Id.* at 573. Also, as to Chief Joe Stewart, the arson investigator, there is no indication that his arrival was much later than Captain Spears. Chief Stewart took wood shavings from the floor at the direction of Captain Spears. Therefore, the circuit court was correct in finding that the third walk through the house and the ultimate seizure of the evidence were legally justified.

¶24. For the foregoing reasons we find that the circuit court did not err in denying the defendant's Motion to Suppress the evidence seized from Edith's residence. This assignment of error is without merit.

<strong>B.</strong>

¶25. Taylor raises the issue of whether the trial court erred in not directing a verdict of not guilty. A denial of a motion for a directed verdict should not be disturbed on appeal unless viewing the evidence in the light most favorable to the non-moving party it can be found that reasonable, fair-minded persons could only find the defendant not guilty. *Morgan v. State*, 703 So. 2d 832, 835 (Miss. 1997) (quoting *Hopson v. State*, 625 So. 2d 395, 405 (Miss.1993)). In overruling Taylor's motion for a directed verdict at the close of the State's case, the circuit court held that in viewing the evidence most favorable to the State the jury could find the defendant guilty of either murder or manslaughter. The evidence, most favorable to the State, showed, *inter alia*:

> (1) Taylor had kicked Edith in the head earlier that day and was cussing at her.

> (2) Edith and Taylor were alone in the house when Edith caught fire.

(3) Edith died as a result of the burns.

(4) The burns to Edith were the result of someone purposefully throwing an accelerant on her and igniting her.

(5) Edith indicated that Taylor was the one who poured something on her and set her afire.

(6) Witnesses smelled kerosene and saw matches and an open hurricane lamp close to where Edith burned.

Based on the foregoing evidence, this Court concludes that the circuit court was correct in holding that reasonable, fair-minded jurors could find Taylor guilty. Therefore, this assignment of error is without merit.

## C.

¶26. Taylor claims that the evidence presented at trial was insufficient to support his conviction. In reviewing the sufficiency of the evidence the conviction will be upheld unless on the evidence, as viewed in the light most consistent with the verdict, no reasonable fair-minded juror could find the defendant guilty. *Evans v. State*, Nos. 93-DP-01173-SCT, 94-CA-00176, 1997 WL 562044, at *82 (Miss. Sept. 11, 1997) (quoting *Taylor v. State*, 672 So. 2d 1246, 1255 (Miss. 1996), *cert. denied*, 117 S. Ct. 486 (1996), *reh'g denied*, 117 S. Ct. 755 (1997) (quoting *McFee v. State*, 511 So. 2d 130, 133-34 (Miss. 1987))); *Holland v. State*, 705 So. 2d 307, 356 (Miss. 1997). In addition to the evidence presented on behalf of the State, the defendant offered the following evidence on his behalf:

(1) Dr. Sperry testified that it was his opinion that Edith's injuries were self-inflicted.

(2) Dr. Sperry also testified that because of her intoxicated state, the things Edith said were not necessarily related to reality.

(3) Ms. Joyner testified to impeach Ms. Delancey, stating that in previous interviews Ms. Delancey had not stated that Edith said anything was poured on her.

(4) Various witnesses testified that Edith had on several occasions discussed committing suicide and burning down her house.

¶27. In *Evans v. State*, Nos. 93-DP-01173-SCT, 94-CA-00176-SCT, 1997 WL 562044, at *67 (Miss. Sept 11, 1997) (quoting *Bond v. State*, 249 Miss. 352, 357, 162 So. 2d 510, 512 (1964)), this Court held that it was the jury's responsibility to judge the credibility of the various witnesses.

In a criminal prosecution, the jury may accept the testimony of some witnesses and reject that of others, and may accept in part and reject in part the testimony of any witnesses, or may believe part of the evidence on behalf of the state and part of that for the accused, and the credibility of such witnesses is not for the reviewing court, but only for the jury.

*Id.* (citations omitted). Based on the strictures of our standard of review it can not be said that reasonable and fair-minded persons could not find the defendant guilty. Therefore, the foregoing assignment of error is without merit.

## D.

¶28. In his fourth assignment of error Taylor claims that the circuit court erred in the jury selection process by requiring him to give race-neutral reasons for peremptorily striking white jurors without first finding a pattern of exclusion and then not accepting the defendant's reasons given. The State argues that the defendant is procedurally barred from raising this issue. Not only did the defendant fail to object to the circuit court's ruling, the defendant readily agreed to the requirement that he offer race-neutral reasons for peremptorily striking white jurors.

¶29. While it is true that Taylor did not object to the requirement that he state race- neutral reasons, the issue raised here goes beyond that process. It speaks also to the fact that the trial court ultimately and erroneously denied strikes based on race-neutral reasons.

¶30. A ***Batson*** analysis is a three part inquiry. First, the objecting party is required to make a *prima facie* showing that peremptory strikes are being exercised on the basis of race. ***McFarland v. State***, 707 So. 2d 166, 171 (Miss. 1997); ***Mack v. State***, 650 So. 2d 1289, 1296 (Miss. 1994) (citing ***Batson v. Kentucky***, 476 U.S. 79, 96 (1986)). Second, after the defendant makes such a showing the burden then shifts to the party exercising the strikes to offer a race-neutral reason for the challenge. ***Id.*** Third, the court must determine if the opposing party has met the burden of proving that purposeful discrimination was the motive behind the challenges. ***McFarland***, 707 So. 2d at 171.

¶31. In the case at bar, after the State had peremptorily struck two black jurors the defendant asked that the State be required to come forward with race-neutral reasons for the strikes pursuant to ***Batson***. The circuit court held that if the defendant invoked ***Batson***, the Supreme Court would require that the defense offer race-neutral reasons for any peremptory strikes it exercised against white jurors. This ruling by the circuit court was in error.

¶32. Taylor's invocation of ***Batson*** did not automatically require him to come forward with race-neutral reasons for exercising peremptory strikes. The State has a burden to raise an objection and show that a defendant has a pattern of using peremptory challenges to excuse persons of a particular racial group. ***Stewart v. State***, 662 So. 2d 552, 560 (Miss. 1995). It is reversible error for a trial court to "fail to place the initial burden on the State to establish a *prima facie* case of racial discrimination." ***Id.*** In the case at bar, the State did not object to the defense's exercise of peremptory strikes nor was there a finding of a pattern of racial discrimination against white jurors. At the time the defense attempted to strike the juror who was a school teacher, the defense had struck one (1) white male and two (2) white females, with the court accepting the race-neutral reasons offered. The defense had also accepted seven (7) white males and one (1) white female juror. There was no finding of a pattern of discrimination.

¶33. While the defendant did not object to the court's requirement that he give race-neutral reasons, the defendant also asserts that the court erred in declining to accept as race-neutral the reasons offered by him. The third step in a ***Batson*** analysis requires the trial judge to determine if, in spite of the race-neutral explanation, the opposing party has met its ultimate burden of proving that the challenges were motivated by purposeful discrimination. ***McFarland***, 707 So. 2d at 171. A lower court's decision to accept, or not, an explanation as race-neutral will be reversed only where "they appear clearly erroneous or against the overwhelming weight of the evidence." ***Hatten v. State***, 628 So. 2d 294, 299 (Miss. 1993).

¶34. In evaluating the nature of the explanation necessary to survive a ***Batson*** inquiry, it has been stated:

The second step of this process does not demand an explanation that is persuasive, or even plausible.

"At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the [] explanation, the reason offered will be deemed race neutral."

The Court of Appeals erred by combining *Batson's* second and third steps into one, requiring that the justification tendered at the second step be not just neutral but also at least minimally persuasive, *i.e.*, a "plausible" basis for believing that "the person's ability to perform his or her duties as a juror" will be affected. It is not until the third step that the persuasiveness of the justification becomes relevant...

*Purkett v. Elem*, 514 U.S. 765, 767-68 (1995) (citations omitted).

¶35. The circuit court erred in declining to accept as race-neutral the defense's reasons for striking the jurors, except for the school teacher. In the case of the school teacher the State pointed out that the defense had previously accepted a white male juror with the same qualifications. Although the comparison of the two jurors does not evidence racial motivation, it cannot be said that the challenge was gender-neutral. Therefore, the circuit court's finding that the explanation as to the school teacher was not gender-neutral, was not clearly erroneous.

¶36. However, as to the remaining two jurors whom the defense sought to strike, because they may be needed at their places of employment, the circuit court combined the second and the third steps in the *Batson* analysis. *Purkett*, 514 U.S. at 768. As discussed *supra*, there was no showing of racial or gender motivation in exercising the strikes. And the explanations were neutral in that they were not facially discriminatory. *Id.* There was no analysis of pretext. Therefore, the circuit court was clearly erroneous in failing to accept as race-neutral the explanations the defense gave for striking the two jurors.

## CONCLUSION

¶37. The defendant's assertion that the circuit court should have suppressed the evidence seized from Edith's residence is without merit. The defendant's assertions that the circuit court should have granted his motion for a directed verdict and that the evidence was insufficient to support the verdict, are also without merit. The circuit court committed reversible error, however, by holding that the defendant was required to provide race-neutral reasons for peremptory strikes exercised against white jurors without first requiring the State to object and show a *prima facie* case of racial discrimination. Therefore, this case is reversed and remanded.

¶38. **REVERSED AND REMANDED.**

¶39. **PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., AND WALLER, J., CONCUR. McRAE, J., CONCURS IN RESULT ONLY. SMITH, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY ROBERTS AND MILLS, JJ.**

**SMITH, JUSTICE, DISSENTING:**

¶40. The majority would reverse and remand this case because of supposed *Batson* violations committed

by the trial judge. The trial judge required Charles Taylor to give race-neutral reasons for peremptorily striking white jurors without first finding a pattern of exclusion. The trial court did not accept Taylor's reasons offered for excusing two of the jurors.

¶41. It is true that the procedure required by the lower court was incorrect and amounted to putting the cart before the horse. This Court, in *Stewart v. State*, 662 So. 2d 552, 560 (Miss. 1995) held that it is reversible error for a trial court to fail "to place the initial burden on the State to establish a prima facie case of racial discrimination .. . ."

¶42. However, here the State had already objected to the jurors Taylor selected, and the court allowed those two jurors. Nonetheless, Taylor failed to object to the procedure and, therefore, waived the issue on appeal. In fact, Taylor readily accepted and agreed to the procedure which the trial court required. I therefore disagree with the majority. This issue is procedurally barred on appeal.

¶43. Taylor failed to object to the trial court's procedure which would insure that the jurors selected by both the State and defense were free of racial or gender bias. The record, in fact, reflects that Taylor's counsel agreed to the procedure required by the trial judge, stating eagerly: "We can do that. Or a gender neutral reason on the sex. We're ready." Without an objection, Taylor cannot complain. *Foster v. State*, 639 So. 2d 1263, 1301 (Miss. 1994).

¶44. Even considering the issue alternatively on the merits, there are no merits to Taylor's arguments. Taylor claimed that the trial judge erred in not accepting the proffered race and gender neutral reasons given for striking three jurors.

¶45. In striking the first juror, Taylor's counsel claimed that juror Brown, was a divorced teacher, and that since school was in session she would be needed in the classroom. However, Taylor had already accepted another divorced teacher. Additionally, juror Brown did not ask to be excused, nor did she fill out an affidavit claiming that she needed to be excused from jury duty in order to be in her school classroom.

¶46. Taylor's reasons for challenging the second juror, Stockwell, a pension specialist, were that juror Stockwell **may** be needed at work and it was **possible** that he was related to an attorney in the area with the same last name. Again, the court ruled that the juror could have asked to be excused or submitted an affidavit to that effect had he wanted to be excused. Additionally, there were no questions asked by Taylor of the juror about whether or not he was related to a local attorney. Without evidence to support such an allegation, the trial court concluded that there were a lot of people in the area with the same last name as Stockwell, so kinship was unlikely.

¶47. Taylor attempted to strike the third juror by claiming that he was self employed and **would need** to be at work. Again, the trial judge concluded that the juror did not ask to be excused and could also have submitted an affidavit claiming hardship for being off work while on jury duty. At best, Taylor's reasons were merely speculative. There are legitimate reasons within the record to support the trial judge's conclusion that Taylor's reasons to strike these three jurors were pretextual.

¶48. This Court has stated in *Hatten v. State*, 628 So. 2d 294, 299 (Miss. 1993), that a trial court's decision to accept or reject an explanation as race-neutral will be reversed only where it appears "clearly erroneous or against the overwhelming weight of the evidence." In *Chisolm v. State*, 529 So. 2d 630, 633 (Miss. 1988), this Court stated, "So long as the trial court applies the correct legal standard, we will not

overturn a finding of fact made by a trial judge unless it is clearly erroneous." (quoting *Neil v. State*, 451 So. 2d 743, 753 (Miss. 1984), see also, *Simon v. State*, 679 So. 2d 617, 621-22 (Miss. 1996). In *Batson*, the Supreme Court stated, "[T]he trial judge's finding in the context under consideration here largely will turn on evaluation of credibility, a reveiwing court should ordinarily give those findings great deference." *Batson v. Kentucky*, 476 U.S. 79, 98 n.21 (1986).

¶49. In the case at bar, the trial judge's analysis of the reasons tendered is not be clearly erroneous or against the overwhelming weight of the evidence. Taylor's reasons for striking the three jurors appear to be pretextual. Thus the trial judge was correct to refuse to accept the reasons tendered by Taylor. The trial court should be affirmed.

¶50. I respectfully dissent.

**ROBERTS AND MILLS, JJ., JOIN THIS OPINION.**